(Slip Opinion)     OCTOBER TERM, 2007     1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## EXXON SHIPPING CO. ET AL. *v.* BAKER ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–219.   Argued February 27, 2008—Decided June 25, 2008

In 1989, petitioners' (collectively, Exxon) supertanker grounded on a reef off Alaska, spilling millions of gallons of crude oil into Prince William Sound.  The accident occurred after the tanker's captain, Joseph Hazelwood—who had a history of alcohol abuse and whose blood still had a high alcohol level 11 hours after the spill—inexplicably exited the bridge, leaving a tricky course correction to unlicensed subordinates.  Exxon spent some $2.1 billion in cleanup efforts, pleaded guilty to criminal violations occasioning fines, settled a civil action by the United States and Alaska for at least $900 million, and paid another $303 million in voluntary payments to private parties.  Other civil cases were consolidated into this one, brought against Exxon, Hazelwood, and others to recover economic losses suffered by respondents (hereinafter Baker), who depend on Prince William Sound for their livelihoods.  At Phase I of the trial, the jury found Exxon and Hazelwood reckless (and thus potentially liable for punitive damages) under instructions providing that a corporation is responsible for the reckless acts of employees acting in a managerial capacity in the scope of their employment.  In Phase II, the jury awarded $287 million in compensatory damages to some of the plaintiffs; others had settled their compensatory claims for $22.6 million.  In Phase III, the jury awarded $5,000 in punitive damages against Hazelwood and $5 billion against Exxon.  The Ninth Circuit upheld the Phase I jury instruction on corporate liability and ultimately remitted the punitive damages award against Exxon to $2.5 billion.

*Held:*

1. Because the Court is equally divided on whether maritime law allows corporate liability for punitive damages based on the acts of managerial agents, it leaves the Ninth Circuit's opinion undisturbed

in this respect.  Of course, this disposition is not precedential on the derivative liability question.  See, *e.g., Neil* v. *Biggers*, 409 U. S. 188, 192.  Pp. 7–10.

2. The Clean Water Act's water pollution penalties, 33 U. S. C. §1321, do not preempt punitive-damages awards in maritime spill cases.  Section 1321(b) protects "navigable waters . . . , adjoining shorelines, . . . [and] natural resources," subject to a saving clause reserving "obligations . . . under any . . . law for damages to any . . . privately owned property resulting from [an oil] discharge," §1321*(o)*.  Exxon's admission that the CWA does not displace compensatory remedies for the consequences of water pollution, even those for economic harms, leaves the company with the untenable claim that the CWA somehow preempts punitive damages, but not compensatory damages, for economic loss.  Nothing in the statute points to that result, and the Court has rejected similar attempts to sever remedies from their causes of action, see *Silkwood* v. *Kerr-McGee Corp.,* 464 U. S. 238, 255–256.  There is no clear indication of congressional intent to occupy the entire field of pollution remedies, nor is it likely that punitive damages for private harms will have any frustrating effect on the CWA's remedial scheme.  Pp. 10–15.

3. The punitive damages award against Exxon was excessive as a matter of maritime common law.  In the circumstances of this case, the award should be limited to an amount equal to compensatory damages.  Pp. 15–42.

(a) Although legal codes from ancient times through the Middle Ages called for multiple damages for certain especially harmful acts, modern Anglo-American punitive damages have their roots in 18th-century English law and became widely accepted in American courts by the mid-19th century.  See, *e.g., Day* v. *Woodworth*, 13 How. 363, 371.  Pp. 16–17.

(b) The prevailing American rule limits punitive damages to cases of "enormity," *Day* v. *Woodworth*, 13 How. 363, 371, in which a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for others' rights, or even more deplorable behavior.  The consensus today is that punitive damages are aimed at retribution and deterring harmful conduct.  Pp. 17–21.

(c) State regulation of punitive damages varies.  A few States award them rarely, or not at all, and others permit them only when authorized by statute.  Many States have imposed statutory limits on punitive awards, in the form of absolute monetary caps, a maximum ratio of punitive to compensatory damages, or, frequently, some combination of the two.  Pp. 21–23.

(d) American punitive damages have come under criticism in recent decades, but the most recent studies tend to undercut much of it.

Although some studies show the dollar amounts of awards growing over time, even in real terms, most accounts show that the median ratio of punitive to compensatory awards remains less than 1:1. Nor do the data show a marked increase in the percentage of cases with punitive awards. The real problem is the stark unpredictability of punitive awards. Courts are concerned with fairness as consistency, and the available data suggest that the spread between high and low individual awards is unacceptable. The spread in state civil trials is great, and the outlier cases subject defendants to punitive damages that dwarf the corresponding compensatories. The distribution of judge-assessed awards is narrower, but still remarkable. These ranges might be acceptable if they resulted from efforts to reach a generally accepted optimal level of penalty and deterrence in cases involving a wide range of circumstances, but anecdotal evidence suggests that is not the case, see, *e.g., Gore, supra,* at 565, n. 8. Pp. 24–27.

(e) This Court's response to outlier punitive damages awards has thus far been confined by claims that state-court awards violated due process. See, *e.g., State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 425. In contrast, today's enquiry arises under federal maritime jurisdiction and requires review of a jury award at the level of judge-made federal common law that precedes and should obviate any application of the constitutional standard. In this context, the unpredictability of high punitive awards is in tension with their punitive function because of the implication of unfairness that an eccentrically high punitive verdict carries. A penalty should be reasonably predictable in its severity, so that even Holmes's "bad man" can look ahead with some ability to know what the stakes are in choosing one course of action or another. And a penalty scheme ought to threaten defendants with a fair probability of suffering in like degree for like damage. Cf. *Koon* v. *United States*, 518 U. S. 81, 113. Pp. 28–29.

(f) The Court considers three approaches, one verbal and two quantitative, to arrive at a standard for assessing maritime punitive damages. Pp. 29–42.

(i) The Court is skeptical that verbal formulations are the best insurance against unpredictable outlier punitive awards, in light of its experience with attempts to produce consistency in the analogous business of criminal sentencing. Pp. 29–32.

(ii) Thus, the Court looks to quantified limits. The option of setting a hard-dollar punitive cap, however, is rejected because there is no "standard" tort or contract injury, making it difficult to settle upon a particular dollar figure as appropriate across the board; and because a judicially selected dollar cap would carry the serious drawback that the issue might not return to the docket before there was a

need to revisit the figure selected. Pp. 32–39.

(iii) The more promising alternative is to peg punitive awards to compensatory damages using a ratio or maximum multiple. This is the model in many States and in analogous federal statutes allowing multiple damages. The question is what ratio is most appropriate. An acceptable standard can be found in the studies showing the median ratio of punitive to compensatory awards. Those studies reflect the judgments of juries and judges in thousands of cases as to what punitive awards were appropriate in circumstances reflecting the most down to the least blameworthy conduct, from malice and avarice to recklessness to gross negligence. The data in question put the median ratio for the entire gamut at less than 1:1, meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, awards at or below the median would roughly express jurors' sense of reasonable penalties in cases like this one that have no earmarks of exceptional blameworthiness. Accordingly, the Court finds that a 1:1 ratio is a fair upper limit in such maritime cases. Pp. 39–42.

(iv) Applying this standard to the present case, the Court takes for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million. A punitive-to-compensatory ratio of 1:1 thus yields maximum punitive damages in that amount. P. 42.

472 F. 3d 600 and 490 F. 3d 1066, vacated and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined, and in which STEVENS, GINSBURG, and BREYER, JJ., joined, as to Parts I, II, and III. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined. STEVENS, J., GINSBURG, J., and BREYER, J., filed opinions concurring in part and dissenting in part. ALITO, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports. Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–219

EXXON SHIPPING COMPANY, ET AL., PETITIONERS *v.*
GRANT BAKER ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2008]

JUSTICE SOUTER delivered the opinion of the Court.

There are three questions of maritime law before us: whether a shipowner may be liable for punitive damages without acquiescence in the actions causing harm, whether punitive damages have been barred implicitly by federal statutory law making no provision for them, and whether the award of $2.5 billion in this case is greater than maritime law should allow in the circumstances. We are equally divided on the owner's derivative liability, and hold that the federal statutory law does not bar a punitive award on top of damages for economic loss, but that the award here should be limited to an amount equal to compensatory damages.

I

On March 24, 1989, the supertanker *Exxon Valdez* grounded on Bligh Reef off the Alaskan coast, fracturing its hull and spilling millions of gallons of crude oil into Prince William Sound. The owner, petitioner Exxon Shipping Co. (now SeaRiver Maritime, Inc.), and its owner, petitioner Exxon Mobil Corp. (collectively, Exxon), have settled state and federal claims for environmental dam-

age, with payments exceeding $1 billion, and this action by respondent Baker and others, including commercial fishermen and native Alaskans, was brought for economic losses to individuals dependent on Prince William Sound for their livelihoods.

## A

The tanker was over 900 feet long and was used by Exxon to carry crude oil from the end of the Trans-Alaska Pipeline in Valdez, Alaska, to the lower 48 States. On the night of the spill it was carrying 53 million gallons of crude oil, or over a million barrels. Its captain was one Joseph Hazelwood, who had completed a 28-day alcohol treatment program while employed by Exxon, as his superiors knew, but dropped out of a prescribed follow-up program and stopped going to Alcoholics Anonymous meetings. According to the District Court, "[t]here was evidence presented to the jury that after Hazelwood was released from [residential treatment], he drank in bars, parking lots, apartments, airports, airplanes, restaurants, hotels, at various ports, and aboard Exxon tankers." *In re Exxon Valdez,* No. A89–0095–CV, Order No. 265 (D. Alaska, Jan. 27, 1995), p. 5, App. F to Pet. for Cert. 255a–256a (hereinafter Order 265). The jury also heard contested testimony that Hazelwood drank with Exxon officials and that members of the Exxon management knew of his relapse. See *ibid.* Although Exxon had a clear policy prohibiting employees from serving onboard within four hours of consuming alcohol, see *In re Exxon Valdez,* 270 F. 3d 1215, 1238 (CA9 2001), Exxon presented no evidence that it monitored Hazelwood after his return to duty or considered giving him a shoreside assignment, see Order 265, p. 5, *supra,* at 256a. Witnesses testified that before the *Valdez* left port on the night of the disaster, Hazelwood downed at least five double vodkas in the waterfront bars of Valdez, an intake of about 15 ounces of 80-proof

alcohol, enough "that a non-alcoholic would have passed out." 270 F. 3d, at 1236.

The ship sailed at 9:12 p.m. on March 23, 1989, guided by a state-licensed pilot for the first leg out, through the Valdez Narrows. At 11:20 p.m., Hazelwood took active control and, owing to poor conditions in the outbound shipping lane, radioed the Coast Guard for permission to move east across the inbound lane to a less icy path. Under the conditions, this was a standard move, which the last outbound tanker had also taken, and the Coast Guard cleared the *Valdez* to cross the inbound lane. The tanker accordingly steered east toward clearer waters, but the move put it in the path of an underwater reef off Bligh Island, thus requiring a turn back west into the shipping lane around Busby Light, north of the reef.

Two minutes before the required turn, however, Hazelwood left the bridge and went down to his cabin in order, he said, to do paperwork. This decision was inexplicable. There was expert testimony that, even if their presence is not strictly necessary, captains simply do not quit the bridge during maneuvers like this, and no paperwork could have justified it. And in fact the evidence was that Hazelwood's presence was required, both because there should have been two officers on the bridge at all times and his departure left only one, and because he was the only person on the entire ship licensed to navigate this part of Prince William Sound. To make matters worse, before going below Hazelwood put the tanker on autopilot, speeding it up, making the turn trickier, and any mistake harder to correct.

As Hazelwood left, he instructed the remaining officer, third mate Joseph Cousins, to move the tanker back into the shipping lane once it came abeam of Busby Light. Cousins, unlicensed to navigate in those waters, was left alone with helmsman Robert Kagan, a nonofficer. For reasons that remain a mystery, they failed to make the

turn at Busby Light, and a later emergency maneuver attempted by Cousins came too late. The tanker ran aground on Bligh Reef, tearing the hull open and spilling 11 million gallons of crude oil into Prince William Sound.

After Hazelwood returned to the bridge and reported the grounding to the Coast Guard, he tried but failed to rock the *Valdez* off the reef, a maneuver which could have spilled more oil and caused the ship to founder.[1] The Coast Guard's nearly immediate response included a blood test of Hazelwood (the validity of which Exxon disputes) showing a blood-alcohol level of .061 eleven hours after the spill. Supp. App. 307sa. Experts testified that to have this much alcohol in his bloodstream so long after the accident, Hazelwood at the time of the spill must have had a blood-alcohol level of around .241, Order 265, p. 5, *supra,* at 256a, three times the legal limit for driving in most States.

In the aftermath of the disaster, Exxon spent around $2.1 billion in cleanup efforts. The United States charged the company with criminal violations of the Clean Water Act, 33 U. S. C. §§1311(a) and 1319(c)(1); the Refuse Act of 1899, 33 U. S. C. §§407 and 411; the Migratory Bird Treaty Act, 16 U. S. C. §§703 and 707(a); the Ports and Waterways Safety Act, 33 U. S. C. §1232(b)(1); and the Dangerous Cargo Act, 46 U. S. C. §3718(b). Exxon pleaded guilty to violations of the Clean Water Act, the Refuse Act, and the Migratory Bird Treaty Act and agreed to pay a

—————

[1] As it turned out, the tanker survived the accident and remained in Exxon's fleet, which it subsequently transferred to a wholly owned subsidiary, SeaRiver Maritime, Inc. The *Valdez* "was renamed several times, finally to the *SeaRiver Mediterranean,* [and] carried oil between the Persian Gulf and Japan, Singapore, and Australia for 12 years. . . . In 2002, the ship was pulled from service and 'laid up' off a foreign port (just where the owners won't say) and prepared for retirement, although, according to some reports, the vessel continues in service under a foreign flag." *Exxon Valdez* Spill Anniversary Marked, 30 Oil Spill Intelligence Report 2 (Mar. 29, 2007).

$150 million fine, later reduced to $25 million plus restitu-
tion of $100 million. A civil action by the United States
and the State of Alaska for environmental harms ended
with a consent decree for Exxon to pay at least $900 mil-
lion toward restoring natural resources, and it paid an-
other $303 million in voluntary settlements with fisher-
men, property owners, and other private parties.

B

The remaining civil cases were consolidated into this
one against Exxon, Hazelwood, and others. The District
Court for the District of Alaska divided the plaintiffs
seeking compensatory damages into three classes: com-
mercial fishermen, Native Alaskans, and landowners. At
Exxon's behest, the court also certified a mandatory class
of all plaintiffs seeking punitive damages, whose number
topped 32,000. Respondents here, to whom we will refer
as Baker for convenience, are members of that class.

For the purposes of the case, Exxon stipulated to its
negligence in the *Valdez* disaster and its ensuing liability
for compensatory damages. The court designed the trial
accordingly: Phase I considered Exxon and Hazelwood's
recklessness and thus their potential for punitive liability;
Phase II set compensatory damages for commercial fish-
ermen and Native Alaksans; and Phase III determined the
amount of punitive damages for which Hazelwood and
Exxon were each liable. (A contemplated Phase IV, set-
ting compensation for still other plaintiffs, was obviated
by settlement.)

In Phase I, the jury heard extensive testimony about
Hazelwood's alcoholism and his conduct on the night of the
spill, as well as conflicting testimony about Exxon officials'
knowledge of Hazelwood's backslide. At the close of Phase
I, the Court instructed the jury in part that

"[a] corporation is responsible for the reckless acts of
those employees who are employed in a managerial

capacity while acting in the scope of their employ-
ment. The reckless act or omission of a managerial of-
ficer or employee of a corporation, in the course and
scope of the performance of his duties, is held in law
to be the reckless act or omission of the corporation."
App. K to Pet. for Cert. 301a.

The Court went on that "[a]n employee of a corporation is
employed in a managerial capacity if the employee super-
vises other employees and has responsibility for, and
authority over, a particular aspect of the corporation's
business." *Ibid.* Exxon did not dispute that Hazelwood
was a managerial employee under this definition, see
App. G, *id.,* at 264a, n. 8, and the jury found both Hazel-
wood and Exxon reckless and thus potentially liable for
punitive damages, App. L, *id.,* at 303a.[2]

In Phase II the jury awarded $287 million in compensa-
tory damages to the commercial fishermen. After the
Court deducted released claims, settlements, and other
payments, the balance outstanding was $19,590,257.
Meanwhile, most of the Native Alaskan class had settled
their compensatory claims for $20 million, and those who
opted out of that settlement ultimately settled for a total
of around $2.6 million.

In Phase III, the jury heard about Exxon's manage-
ment's acts and omissions arguably relevant to the spill.
See App. 1291–1320, 1353–1367. At the close of evidence,
the court instructed the jurors on the purposes of punitive
damages, emphasizing that they were designed not to
provide compensatory relief but to punish and deter the

---

[2] The jury was not asked to consider the possibility of any degree of
fault beyond the range of reckless conduct. The record sent up to us
shows that some thought was given to a trial plan that would have
authorized jury findings as to greater degrees of culpability, see App.
164, but that plan was not adopted, whatever the reason; Baker does
not argue this was error.

defendants. See App. to Brief in Opposition 12a–14a. The court charged the jury to consider the reprehensibility of the defendants' conduct, their financial condition, the magnitude of the harm, and any mitigating facts. *Id.,* at 15a. The jury awarded $5,000 in punitive damages against Hazelwood and $5 billion against Exxon.

On appeal, the Court of Appeals for the Ninth Circuit upheld the Phase I jury instruction on corporate liability for acts of managerial agents under Circuit precedent. See *In re Exxon Valdez,* 270 F. 3d, at 1236 (citing *Protectus Alpha Nav. Co.* v. *North Pacific Grain Growers, Inc.,* 767 F. 2d 1379 (CA9 1985)). With respect to the size of the punitive damages award, however, the Circuit remanded twice for adjustments in light of this Court's due process cases before ultimately itself remitting the award to $2.5 billion. See 270 F. 3d, at 1246–1247; 472 F. 3d 600, 601, 625 (2006) *(per curiam),* and 490 F. 3d 1066, 1068 (2007).

We granted certiorari to consider whether maritime law allows corporate liability for punitive damages on the basis of the acts of managerial agents, whether the Clean Water Act (CWA), 86 Stat. 816, 33 U. S. C. §1251 *et seq.* (2000 ed. and Supp. V), forecloses the award of punitive damages in maritime spill cases, and whether the punitive damages awarded against Exxon in this case were excessive as a matter of maritime common law. 552 U. S. ___ (2007). We now vacate and remand.

## II

On the first question, Exxon says that it was error to instruct the jury that a corporation "is responsible for the reckless acts of . . . employees . . . in a managerial capacity while acting in the scope of their employment."[3] App. K to

_____

[3] Baker emphasizes that the Phase I jury instructions also allowed the jury to find Exxon independently reckless, and that the evidence for fixing Exxon's punitive liability at Phase III revolved around the recklessness of company officials in supervising Hazelwood and enforc-

Pet. for Cert. 301a.  The Courts of Appeals have split on this issue,[4] and the company relies primarily on two cases, *The Amiable Nancy*, 3 Wheat. 546 (1818), and *Lake Shore & Michigan Southern R. Co.* v. *Prentice*, 147 U. S. 101 (1893), to argue that this Court's precedents are clear that punitive damages are not available against a shipowner for a shipmaster's recklessness.  The former was a suit in admiralty against the owners of *The Scourge*, a privateer whose officers and crew boarded and plundered a neutral ship, *The Amiable Nancy*.  In upholding an award of compensatory damages, Justice Story observed that,

> "if this were a suit against the original wrong-doers, it might be proper to . . . visit upon them in the shape of exemplary damages, the proper punishment which belongs to such lawless misconduct.  But it is to be considered, that this is a suit against the owners of the privateer, upon whom the law has, from motives of policy, devolved a responsibility for the conduct of the officers and crew employed by them, and yet, from the nature of the service, they can *scarcely ever* be able to

ing Exxon's alcohol policies.  Thus, Baker argues, it is entirely possible that the jury found Exxon reckless in its own right, and in no way predicated its liability for punitive damages on Exxon's responsibility for Hazelwood's conduct.  Brief for Respondents 36–39.

The fact remains, however, that the jury was not required to state the basis of Exxon's recklessness, and the basis for the finding could have been Exxon's own recklessness or just Hazelwood's.  Any error in instructing on the latter ground cannot be overlooked, because "when it is impossible to know, in view of the general verdict returned whether the jury imposed liability on a permissible or an impermissible ground, the judgment must be reversed and the case remanded." *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6, 11 (1970) (internal quotation marks omitted).

[4] Compare *Protectus Alpha Nav. Co.* v. *North Pacific Grain Growers, Inc.,* 767 F. 2d 1379, 1386 (CA9 1985) (adopting Restatement (Second) of Torts rule), with *CEH, Inc.* v. *F/V Seafarer*, 70 F. 3d 694, 705 (CA1 1995); *In re P & E Boat Rentals, Inc.*, 872 F. 2d 642, 652 (CA5 1989); *United States Steel Corp.* v. *Fuhrman*, 407 F. 2d 1143, 1148 (CA6 1969).

secure to themselves an adequate indemnity in cases of loss. They are innocent of the demerit of this transaction, having neither directed it, nor countenanced it, nor participated in it in the slightest degree. Under such circumstances, we are of opinion, that they are bound to repair all the real injuries and personal wrongs sustained by the libellants, but they are not bound to the extent of vindictive damages." *The Amiable Nancy, supra,* at 558–559 (emphasis in original).

Exxon takes this statement as a rule barring punitive liability against shipowners for actions by underlings not "directed," "countenanced," or "participated in" by the owners.

Exxon further claims that the Court confirmed this rule in *Lake Shore, supra,* a railway case in which the Court relied on *The Amiable Nancy* to announce, as a matter of pre-*Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938), general common law, that "[t]hough [a] principal is liable to make compensation for [intentional torts] by his agent, he is not liable to be punished by exemplary damages for an intent in which he did not participate." 147 U. S., at 110. Because maritime law remains federal common law, and because the Court has never revisited the issue, Exxon argues that *Lake Shore* endures as sound evidence of maritime law. And even if the rule of *Amiable Nancy* and *Lake Shore* does not control, Exxon urges the Court to fall back to a modern-day variant adopted in the context of Title VII of the Civil Rights Act of 1964 in *Kolstad* v. *American Dental Assn.*, 527 U. S. 526, 544 (1999), that employers are not subject to punitive damages for discriminatory conduct by their managerial employees if they can show that they maintained and enforced good-faith antidiscrimination policies.

Baker supports the Ninth Circuit in upholding the

instruction, as it did on the authority of *Protectus Alpha Nav. Co.*, 767 F. 2d 1379, which followed the Restatement rule recognizing corporate liability in punitive damages for reckless acts of managerial employees, see 4 Restatement (Second) of Torts §909(c) (1977) (hereinafter Restatement). Baker says that *The Amiable Nancy* offers nothing but dictum, because punitive damages were not at issue, and that *Lake Shore* merely rejected company liability for the acts of a railroad conductor, while saying nothing about liability for agents higher up the ladder, like ship captains. He also makes the broader points that the opinion was criticized for failing to reflect the majority rule of its own time, not to mention its conflict with the *respondeat superior* rule in the overwhelming share of land-based jurisdictions today. Baker argues that the maritime rule should conform to modern land-based common law, where a majority of States allow punitive damages for the conduct of any employee, and most others follow the Restatement, imposing liability for managerial agents.

The Court is equally divided on this question, and "[i]f the judges are divided, the reversal cannot be had, for no order can be made." *Durant* v. *Essex Co.*, 7 Wall. 107, 112 (1869). We therefore leave the Ninth Circuit's opinion undisturbed in this respect, though it should go without saying that the disposition here is not precedential on the derivative liability question. See, *e.g., Neil* v. *Biggers*, 409 U. S. 188, 192 (1972); *Ohio ex rel. Eaton* v. *Price*, 364 U. S. 263, 264 (1960) (opinion of Brennan, J.).

## III

Exxon next says that, whatever the availability of maritime punitive damages at common law, the CWA preempts them. Baker responds with both procedural and merits arguments, and although we do not dispose of the issue on procedure, a short foray into its history is worthwhile as a cautionary tale.

At the pretrial stage, the District Court controlled a flood of motions by an order staying them for any purpose except discovery. The court ultimately adopted a case-management plan allowing receipt of seven specific summary judgment motions already scheduled, and requiring a party with additional motions to obtain the court's leave. One of the motions scheduled sought summary judgment for Exxon on the ground that the Trans-Alaska Pipeline Authorization Act, 87 Stat. 584, 43 U. S. C. §§1651–1656, displaced maritime common law and foreclosed the availability of punitive damages. The District Court denied the motion.

After the jury returned the Phase III punitive-damages verdict on September 16, 1994, the parties stipulated that all post-trial Federal Rules of Civil Procedure 50 and 59 motions would be filed by September 30, and the court so ordered. App. 1410–1411. Exxon filed 11 of them, including several seeking a new trial or judgment as a matter of law on one ground or another going to the punitive damages award, all of which were denied along with the rest. On October 23, 1995, almost 13 months after the stipulated motions deadline, Exxon moved for the District Court to suspend the motions stay, App. to Brief in Opposition 28a–29a, to allow it to file a "Motion and Renewed Motion . . . for Judgment on Punitive Damages Claims" under Rules 49(a) and 58(2) and, "to the extent they may be applicable, pursuant to Rules 50(b), 56(b), 56(d), 59(a), and 59(e),"[5] App. to Brief in Opposition 30a–31a. Exxon's

---

[5] Most of the rules under which Exxon sought relief are inapplicable on their face. See Fed. Rules Civ. Proc. 49(a), 56(b), (d), and 58(2). Rules 50 and 59 are less inapt: they allow, respectively, entry of judgment as a matter of law and alteration or amendment of the judgment. (At oral argument, counsel for Exxon ultimately characterized the motion as one under Rule 50. Tr. of Oral Arg. 25.)

But to say that Rules 50 and 59 are less inapt than the other Rules is a long way from saying they are apt. A motion under Rule 50(b) is not

accompanying memorandum asserted that two recent cases, *Glynn* v. *Roy Al Boat Management Corp.,* 57 F. 3d 1495 (CA9 1995), and *Guevara* v. *Maritime Overseas Corp.,* 59 F. 3d 1496 (CA5 1995), suggested that the rule of maritime punitive damages was displaced by federal statutes, including the CWA. On November 2, 1995, the District Court summarily denied Exxon's request to file the motion, App. to Brief in Opposition 35a, and in January 1996 (following the settlement of the Phase IV compensatory claims) the court entered final judgment.

Exxon renewed the CWA preemption argument before the Ninth Circuit. The Court of Appeals recognized that Exxon had raised the CWA argument for the first time 13 months after the Phase III verdict, but decided that the claim "should not be treated as waived," because Exxon had "consistently argued statutory preemption" throughout the litigation, and the question was of "massive . . . significance" given the "ambiguous circumstances" of the case. 270 F. 3d, at 1229. On the merits, the Circuit held that the CWA did not preempt maritime common law on punitive damages. *Id.,* at 1230.

Although we agree with the Ninth Circuit's conclusion, its reasons for reaching it do not hold up. First, the reason the court thought that the CWA issue was not in fact

––––––––––

allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury. See Rule 50(b); see also, *e.g., Zachar* v. *Lee*, 363 F. 3d 70, 73–74 (CA1 2004); 9B C. Wright & A. Miller, Federal Practice and Procedure §2537, pp. 603–604 (3d ed. 2008). Rule 59(e) permits a court to alter or amend a judgment, but it "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." 11 C. Wright & A. Miller, Federal Practice and Procedure §2810.1, pp. 127–128 (2d ed. 1995) (footnotes omitted). Where Exxon has been unable to demonstrate that any rule supported the motion, we need not choose the best of the worst, and risk implying that this last-minute motion was appropriate under any rule. Suffice it to say that, whatever type of motion it was supposed to be, it was very, very late.

waived was that Exxon had alleged other statutory grounds for preemption from the outset of the trial. But that is not enough. It is true that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee* v. *Escondido*, 503 U. S. 519, 534 (1992). But this principle stops well short of legitimizing Exxon's untimely motion. If "statutory preemption" were a sufficient claim to give Exxon license to rely on newly cited statutes anytime it wished, a litigant could add new constitutional claims as he went along, simply because he had "consistently argued" that a challenged regulation was unconstitutional. See *id.,* at 533 (rejecting substantive due process claim by takings petitioners who failed to preserve it below); *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257, 277, n. 23 (1989) (rejecting due process claim by Eighth-Amendment petitioners).

That said, the motion still addressed the Circuit's discretion, to which the "massive" significance of the question and the "ambiguous circumstances" of the case were said to be relevant. 270 F. 3d, at 1229. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below," *Singleton* v. *Wulff*, 428 U. S. 106, 120 (1976), when to deviate from this rule being a matter "left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases," *id.,* at 121. We have previously stopped short of stating a general principle to contain appellate courts' discretion, see *ibid.,* and we exercise the same restraint today.[6]

––––––––––

[6] We do have to say, though, that the Court of Appeals gave short shrift to the District Court's commendable management of this gargantuan litigation, and if the case turned on the propriety of the Circuit's decision to reach the preemption issue we would take up the claim that it exceeded its discretion. Instead, we will only say that to the extent the Ninth Circuit implied that the unusual circumstances of this case

  As to the merits, we agree with the Ninth Circuit that
Exxon's late-raised CWA claim should fail.  There are two
ways to construe Exxon's argument that the CWA's penal-
ties for water pollution, see 33 U. S. C. §1321 (2000 ed.
and Supp. V), preempt the common law punitive-damages
remedies at issue here.  The company could be saying that
any tort action predicated on an oil spill is preempted
unless §1321 expressly preserves it.  Section 1321(b) pro-
tects "the navigable waters of the United States, adjoining
shorelines, . . . [and] natural resources" of the United
States, subject to a saving clause reserving "obligations . . .
under any provision of law for damages to any publicly
owned or privately owned property resulting from a dis-
charge of any oil," §1321*(o)*.  Exxon could be arguing that,
because the saving clause makes no mention of preserving
punitive damages for economic loss, they are preempted.
But so, of course, would a number of other categories of
damages awards that Exxon did not claim were pre-
empted.  If Exxon were correct here, there would be pre-
emption of provisions for compensatory damages for

_____

called for an exception to regular practice, we think the record points
the other way.

  Of course the Court of Appeals was correct that the case was complex
and significant, so much so, in fact, that the District Court was fairly
required to divide it into four phases, to oversee a punitive-damages
class of 32,000 people, and to manage a motions industry that threat-
ened to halt progress completely.  But the complexity of a case does not
eliminate the value of waiver and forfeiture rules, which ensure that
parties can determine when an issue is out of the case, and that litiga-
tion remains, to the extent possible, an orderly progression.  "The
reason for the rules is not that litigation is a game, like golf, with
arbitrary rules to test the skill of the players.  Rather, litigation is a
'winnowing process,' and the procedures for preserving or waiving
issues are part of the machinery by which courts narrow what remains
to be decided." *Poliquin* v. *Garden Way, Inc.,* 989 F. 2d 527, 531 (CA1
1993) (Boudin, J.) (citation omitted).  The District Court's sensible
efforts to impose order upon the issues in play and the progress of the
trial deserve our respect.

thwarting economic activity or, for that matter, compensatory damages for physical, personal injury from oil spills or other water pollution.  But we find it too hard to conclude that a statute expressly geared to protecting "water," "shorelines," and "natural resources" was intended to eliminate *sub silentio* oil companies' common law duties to refrain from injuring the bodies and livelihoods of private individuals.

Perhaps on account of its overbreadth, Exxon disclaims taking this position, admitting that the CWA does not displace compensatory remedies for consequences of water pollution, even those for economic harms.  See, *e.g.,* Reply Brief for Petitioners 15–16.  This concession, however, leaves Exxon with the equally untenable claim that the CWA somehow preempts punitive damages, but not compensatory damages, for economic loss.  But nothing in the statutory text points to fragmenting the recovery scheme this way, and we have rejected similar attempts to sever remedies from their causes of action.  See *Silkwood* v. *Kerr-McGee Corp.,* 464 U. S. 238, 255–256 (1984).  All in all, we see no clear indication of congressional intent to occupy the entire field of pollution remedies, see, *e.g., United States* v. *Texas*, 507 U. S. 529, 534 (1993) ("In order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law" (internal quotation marks omitted)); nor for that matter do we perceive that punitive damages for private harms will have any frustrating effect on the CWA remedial scheme, which would point to preemption.[7]

——————

[7] In this respect, this case differs from two invoked by Exxon, *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.,* 453 U. S. 1 (1981), and *Milwaukee* v. *Illinois,* 451 U. S. 304 (1981), where plaintiffs' common law nuisance claims amounted to arguments for effluent-discharge standards different from those provided by the CWA. Here, Baker's private claims for economic injury do not threaten similar interference with federal regulatory goals with respect to "water,"

### IV

Finally, Exxon raises an issue of first impression about punitive damages in maritime law, which falls within a federal court's jurisdiction to decide in the manner of a common law court, subject to the authority of Congress to legislate otherwise if it disagrees with the judicial result. See U. S. Const., Art. III, §2, cl. 1; see, *e.g., Edmonds* v. *Compagnie Generale Transatlantique,* 443 U. S. 256, 259 (1979) ("Admiralty law is judge-made law to a great extent"); *Romero* v. *International Terminal Operating Co.,* 358 U. S. 354, 360–361 (1959) (constitutional grant "empowered the federal courts . . . to continue the development of [maritime] law"). In addition to its resistance to derivative liability for punitive damages and its preemption claim already disposed of, Exxon challenges the size of the remaining $2.5 billion punitive damages award. Other than its preemption argument, it does not offer a legal ground for concluding that maritime law should never award punitive damages, or that none should be awarded in this case, but it does argue that this award exceeds the bounds justified by the punitive damages goal of deterring reckless (or worse) behavior and the consequently heightened threat of harm. The claim goes to our understanding of the place of punishment in modern civil law and reasonable standards of process in administering punitive law, subjects that call for starting with a brief account of the history behind today's punitive damages.

### A

The modern Anglo-American doctrine of punitive damages dates back at least to 1763, when a pair of decisions by the Court of Common Pleas recognized the availability of damages "for more than the injury received." *Wilkes* v. *Wood,* Lofft 1, 18, 98 Eng. Rep. 489, 498 (1763) (Lord Chief

--------

"shorelines," or "natural resources."

Justice Pratt). In *Wilkes* v. *Wood,* one of the foundations of the Fourth Amendment, exemplary damages awarded against the Secretary of State, responsible for an unlawful search of John Wilkes's papers, were a spectacular £4,000. See generally *Boyd* v. *United States*, 116 U. S. 616, 626 (1886). And in *Huckle* v. *Money,* 2 Wils. 205, 206–207, 95 Eng. Rep. 768, 768–769 (K. B. 1763), the same judge who is recorded in *Wilkes* gave an opinion upholding a jury's award of £300 (against a government officer again) although "if the jury had been confined by their oath to consider the mere personal injury only, perhaps [£20] damages would have been thought damages sufficient."

Awarding damages beyond the compensatory was not, however, a wholly novel idea even then, legal codes from ancient times through the Middle Ages having called for multiple damages for certain especially harmful acts. See, *e.g.,* Code of Hammurabi §8 (R. Harper ed. 1904) (tenfold penalty for stealing the goat of a freed man); Statute of Gloucester, 1278, 6 Edw. I, ch. 5, 1 Stat. at Large 66 (treble damages for waste). But punitive damages were a common law innovation untethered to strict numerical multipliers, and the doctrine promptly crossed the Atlantic, see, *e.g., Genay* v. *Norris,* 1 S. C. L. 6, 7 (1784); *Coryell* v. *Colbaugh,* 1 N. J. L. 77 (1791), to become widely accepted in American courts by the middle of the 19th century, see, *e.g., Day* v. *Woodworth*, 13 How. 363, 371 (1852).

B

Early common law cases offered various rationales for punitive-damages awards, which were then generally dubbed "exemplary," implying that these verdicts were justified as punishment for extraordinary wrongdoing, as in Wilkes's case. Sometimes, though, the extraordinary element emphasized was the damages award itself, the punishment being "for example's sake," *Tullidge* v. *Wade,* 3 Wils. 18, 19, 95 Eng. Rep. 909 (K. B. 1769) (Lord Chief

Justice Wilmot), "to deter from any such proceeding for the future," *Wilkes, supra,* at 19, 98 Eng. Rep., at 498–499. See also *Coryell, supra,* at 77 (instructing the jury "to give damages for *example's* sake, to prevent such offences in [the] future").

A third historical justification, which showed up in some of the early cases, has been noted by recent commentators, and that was the need "to compensate for intangible injuries, compensation which was not otherwise available under the narrow conception of compensatory damages prevalent at the time."[8] *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.*, 532 U. S. 424, 437–438, n. 11 (2001) (citing, *inter alia,* Note, Exemplary Damages in the Law of Torts, 70 Harv. L. Rev. 517 (1957)). But see Sebok, What Did Punitive Damages Do? 78 Chi.-Kent L. Rev. 163, 204 (2003) (arguing that "punitive damages have never served the compensatory function attributed to them by the Court in *Cooper*"). As the century progressed, and "the types of compensatory damages available to plaintiffs . . . broadened," *Cooper Industries, supra,* at 437, n. 11, the consequence was that American courts tended to speak of punitive damages as separate and distinct from compensatory damages, see, *e.g., Day, supra,* at 371 (punitive damages "hav[e] in view the enormity of [the] offence rather than the measure of compensation to the plaintiff"). See generally 1 L. Schlueter, Punitive Damages §§1.3(C)– (D), 1.4(A) (5th ed. 2005) (hereinafter Schlueter) (describ-

———————

[8] Indeed, at least one 19th-century treatise writer asserted that there was "no doctrine of authentically 'punitive' damages" and that "judgments that ostensibly included punitive damages [were] in reality no more than full compensation." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 25 (1991) (SCALIA, J., concurring in judgment) (citing 2 S. Greenleaf, Law of Evidence 235, n. 2 (13th ed. 1876)). "This view," however, "was not widely shared." *Haslip, supra,* at 25 (SCALIA, J., concurring in judgment) (citing other prominent 19th-century treatises). Whatever the actual importance of the subterfuge for compensation may have been, it declined.

ing the "almost total eclipse of the compensatory function" in the decades following the 1830s).

Regardless of the alternative rationales over the years, the consensus today is that punitives are aimed not at compensation but principally at retribution and deterring harmful conduct.[9]  This consensus informs the doctrine in most modern American jurisdictions, where juries are customarily instructed on twin goals of punitive awards. See, *e.g.,* Cal. Jury Instr., Civil, No. 14.72.2 (2008) ("You must now determine whether you should award punitive damages against defendant[s] . . . for the sake of example and by way of punishment"); N. Y. Pattern Jury Instr., Civil, No. 2:278 (2007) ("The purpose of punitive damages is not to compensate the plaintiff but to punish the defendant . . . and thereby to discourage the defendant . . . from acting in a similar way in the future").  The prevailing rule in American courts also limits punitive damages to cases of what the Court in *Day, supra,* at 371, spoke of as "enormity," where a defendant's conduct is "outrageous," 4 Restatement §908(2), owing to "gross negligence," "willful, wanton, and reckless indifference for the rights of others," or behavior even more deplorable, 1 Schlueter §9.3(A).[10]

———————

[9] See, *e.g., Moskovitz* v. *Mount Sinai Medical Center,* 69 Ohio St. 3d 638, 651, 635 N. E. 2d 331, 343 (1994) ("The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct"); *Hamilton Development Co.* v. *Broad Rock Club, Inc.,* 248 Va. 40, 45, 445 S. E. 2d 140, 143 (1994) (same); *Loitz* v. *Remington Arms Co.,* 138 Ill. 2d 404, 414, 563 N. E. 2d 397, 401 (1990) (same); *Green Oil Co.* v. *Hornsby,* 539 So. 2d 218, 222 (Ala. 1989) (same); *Masaki* v. *General Motors Corp.,* 71 Haw. 1, 6, 780 P. 2d 566, 570 (1989) (same); see also *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.,* 532 U. S. 424, 432 (2001) (punitive damages are "intended to punish the defendant and to deter future wrongdoing"); *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 416 (2003) ("[P]unitive damages . . . are aimed at deterrence and retribution"); 4 Restatement §908, Comment *a*.

[10] These standards are from the torts context; different standards apply to other causes of action.

Under the umbrellas of punishment and its aim of deterrence, degrees of relative blameworthiness are apparent. Reckless conduct is not intentional or malicious, nor is it necessarily callous toward the risk of harming others, as opposed to unheedful of it. See, *e.g.,* 2 Restatement §500, Comment *a,* pp. 587–588 (1964) ("Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know . . . of facts which create a high degree of risk of . . . harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so"). Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure. See 4 *id.,* §908, Comment *e*, p. 466 (1979) ("In determining the amount of punitive damages, . . . the trier of fact can properly consider not merely the act itself but all the circumstances including the motives of the wrongdoer . . ."); cf. Alaska Stat. §09.17.020(g) (2006) (higher statutory limit applies where conduct was motivated by financial gain and its adverse consequences were known to the defendant); Ark. Code Ann. §16–55–208(b) (2005) (statutory limit does not apply where the defendant intentionally pursued a course of conduct for the purpose of causing injury or damage).

Regardless of culpability, however, heavier punitive awards have been thought to be justifiable when wrongdoing is hard to detect (increasing chances of getting away with it), see, *e.g., BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 582 (1996) ("A higher ratio may also be justified in cases in which the injury is hard to detect"), or when the value of injury and the corresponding compensatory award are small (providing low incentives to sue), see, *e.g.,*

*ibid.* ("[L]ow awards of compensatory damages may properly support a higher ratio . . . if, for example, a particularly egregious act has resulted in only a small amount of economic damages"); 4 Restatement §908, Comment *c,* p. 465 ("Thus an award of nominal damages . . . is enough to support a further award of punitive damages, when a tort, . . . is committed for an outrageous purpose, but no significant harm has resulted"). And, with a broadly analogous object, some regulatory schemes provide by statute for multiple recovery in order to induce private litigation to supplement official enforcement that might fall short if unaided. See, *e.g., Reiter* v. *Sonotone Corp.,* 442 U. S. 330, 344 (1979) (discussing antitrust treble damages).

## C

State regulation of punitive damages varies. A few States award them rarely, or not at all. Nebraska bars punitive damages entirely, on state constitutional grounds. See, *e.g., Distinctive Printing and Packaging Co.* v. *Cox,* 232 Neb. 846, 857, 443 N. W. 2d 566, 574 (1989) *(per curiam).* Four others permit punitive damages only when authorized by statute: Louisiana, Massachusetts, and Washington as a matter of common law, and New Hampshire by statute codifying common law tradition. See *Ross* v. *Conoco,* 2002–0299, p. 14 (La. 10/15/02), 828 So. 2d 546, 555; *Flesner* v. *Technical Communications Corp.,* 410 Mass. 805, 813, 575 N. E. 2d 1107, 1112 (1991); *Fisher Properties* v. *Arden-Mayfair, Inc.,* 106 Wash. 2d 826, 852, 726 P. 2d 8, 23 (1986); N. H. Rev. Stat. Ann. §507:16 (1997); see also *Fay* v. *Parker,* 53 N. H. 342, 382 (1872). Michigan courts recognize only exemplary damages supportable as compensatory, rather than truly punitive, see *Peisner* v. *Detroit Free Press, Inc.,* 104 Mich. App. 59, 68, 304 N. W. 2d 814, 817 (1981), while Connecticut courts have limited what they call punitive recovery to the "expenses of bringing the legal action, including attor-

ney's fees, less taxable costs," *Larsen Chelsey Realty Co.* v. *Larsen,* 232 Conn. 480, 517, n. 38, 656 A. 2d 1009, 1029, n. 38 (1995).

As for procedure, in most American jurisdictions the amount of the punitive award is generally determined by a jury in the first instance, and that "determination is then reviewed by trial and appellate courts to ensure that it is reasonable." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 15 (1991); see also *Honda Motor Co.* v. *Oberg*, 512 U. S. 415, 421–426 (1994).[11]  Many States have gone further by imposing statutory limits on punitive awards, in the form of absolute monetary caps, see, *e.g.,* Va. Code Ann. §8.01–38.1 (Lexis 2007) ($350,000 cap), a maximum ratio of punitive to compensatory damages, see, *e.g.,* Ohio Rev. Code Ann. §2315.21(D)(2)(a) (Lexis 2001) (2:1 ratio in most tort cases), or, frequently, some combination of the two, see, *e.g.,* Alaska Stat. §09.17.020(f) (2006) (greater of 3:1 ratio or $500,000 in most actions).  The States that rely on a multiplier have adopted a variety of ratios, ranging from 5:1 to 1:1.[12]

Despite these limitations, punitive damages overall are higher and more frequent in the United States than they are anywhere else.  See, *e.g.,* Gotanda, Punitive Damages:

---

[11] A like procedure was followed in this case, without objection.

[12] See, *e.g.,* Mo. Rev. Stat. Ann. §510.265(1) (Vernon Supp. 2008) (greater of 5:1 or $500,000 in most cases); Ala. Code §§6–11–21(a), (d) (2005) (greater of 3:1 or $1.5 million in most personal injury suits, and 3:1 or $500,000 in most other actions); N. D. Cent. Code Ann. §32–03.2–11(4) (Supp. 2007) (greater of 2:1 or $250,000); Colo. Rev. Stat. Ann. §13–21–102(1)(a) (2007) (1:1).

Oklahoma has a graduated scheme, with the limit on the punitive award turning on the nature of the defendant's conduct.  See Okla. Stat., Tit. 23, §9.1(B) (West 2001) (greater of 1:1 or $100,000 in cases involving "reckless disregard"); §9.1(C) (greater of 2:1, $500,000, or the financial benefit derived by the defendant, in cases of intentional and malicious conduct); §9.1(D) (no limit where the conduct is intentional, malicious, and life threatening).

A Comparative Analysis, 42 Colum. J. Transnat'l L. 391, 421 (2004); 2 Schlueter §22.0. In England and Wales, punitive, or exemplary, damages are available only for oppressive, arbitrary, or unconstitutional action by government servants; injuries designed by the defendant to yield a larger profit than the likely cost of compensatory damages; and conduct for which punitive damages are expressly authorized by statute. *Rookes* v. *Barnard*, [1964] 1 All E. R. 367, 410–411 (H. L.). Even in the circumstances where punitive damages are allowed, they are subject to strict, judicially imposed guidelines. The Court of Appeal in *Thompson* v. *Commissioner of Police of Metropolis*, [1998] Q. B. 498, 518, said that a ratio of more than three times the amount of compensatory damages will rarely be appropriate; awards of less than £5,000 are likely unnecessary; awards of £25,000 should be exceptional; and £50,000 should be considered the top.

For further contrast with American practice, Canada and Australia allow exemplary damages for outrageous conduct, but awards are considered extraordinary and rarely issue. See 2 Schlueter §§22.1(B), (D). Noncompensatory damages are not part of the civil-code tradition and thus unavailable in such countries as France, Germany, Austria, and Switzerland. See *id.,* §§22.2(A)–(C), (E). And some legal systems not only decline to recognize punitive damages themselves but refuse to enforce foreign punitive judgments as contrary to public policy. See, *e.g.,* Gotanda, Charting Developments Concerning Punitive Damages: Is the Tide Changing? 45 Colum. J. Transnat'l L. 507, 514, 518, 528 (2007) (noting refusals to enforce judgments by Japanese, Italian, and German courts, positing that such refusals may be on the decline, but concluding, "American parties should not anticipate smooth sailing when seeking to have a domestic punitive damages award recognized and enforced in other countries").

D

American punitive damages have been the target of
audible criticism in recent decades, see, *e.g.,* Note, Devel-
opments, The Paths of Civil Litigation, 113 Harv. L. Rev.
1783, 1784–1788 (2000) (surveying criticism), but the most
recent studies tend to undercut much of it, see *id.,* at
1787–1788. A survey of the literature reveals that discre-
tion to award punitive damages has not mass-produced
runaway awards, and although some studies show the
dollar amounts of punitive-damages awards growing over
time, even in real terms,[13] by most accounts the median
ratio of punitive to compensatory awards has remained

_____

[13] See, *e.g.,* RAND Institute for Civil Justice, D. Hensler & E. Moller,
Trends in Punitive Damages, table 2 (Mar. 1995) (finding an increase
in median awards between the early 1980s and the early 1990s in San
Francisco and Cook Counties); Moller, Pace, & Carroll, Punitive Dam-
ages in Financial Injury Jury Verdicts, 28 J. Legal Studies 283, 307
(1999) (hereinafter Financial Injury Jury Verdicts) (studying jury
verdicts in "Financial Injury" cases in six States and Cook County,
Illinois, and finding a marked increase in the median award between
the late 1980s and the early 1990s); M. Peterson, S. Sarma, & M.
Shanley, Punitive Damages: Empirical Findings 15 (RAND Institute for
Civil Justice 1987) (hereinafter Punitive Damages: Empirical Findings)
(finding that the median punitive award increased nearly 4 times in
San Francisco County between the early 1960s and the early 1980s,
and 43 times in Cook County over the same period). But see T.
Eisenberg et al., Juries, Judges, and Punitive Damages: Empirical
Analyses Using the Civil Justice Survey of State Courts 1992, 1996,
and 2001 Data, 3 J. of Empirical Legal Studies 263, 278 (2006) (herein-
after Juries, Judges, and Punitive Damages) (analyzing Bureau of
Justice Statistics data from 1992, 1996, and 2001, and concluding that
"[n]o statistically significant variation exists in the inflation-adjusted
punitive award level over the three time periods"); Dept. of Justice,
Bureau of Justice Statistics, T. Cohen, Punitive Damage Awards in
Large Counties, 2001, p. 8 (Mar. 2005) (hereinafter Cohen) (compiling
data from the Nation's 75 most populous counties and finding that the
median punitive damage award in civil jury trials decreased between
1992 and 2001).

less than 1:1.[14]　Nor do the data substantiate a marked increase in the percentage of cases with punitive awards over the past several decades.[15]　The figures thus show an overall restraint and suggest that in many instances a

_____

[14] See, *e.g.,* Juries, Judges, and Punitive Damages 269 (reporting median ratios of 0.62:1 in jury trials and 0.66:1 in bench trials using the Bureau of Justice Statistics data from 1992, 1996, and 2001); Vidmar & Rose, Punitive Damages by Juries in Florida, 38 Harv. J. Legis. 487, 492 (2001) (studying civil cases in Florida state courts between 1989 and 1998 and finding a median ratio of 0.67:1). But see Financial Injury Jury Verdicts 307 (finding a median ratio of 1.4:1 in "financial injury" cases in the late 1980s and early 1990s).

[15] See, *e.g.,* Cohen 8 (compiling data from the Nation's 75 most populous counties, and finding that in jury trials where the plaintiff prevailed, the percentage of cases involving punitive awards was 6.1% in 1992 and 5.6% in 2001); Financial Injury Jury Verdicts 307 (finding a statistically significant decrease in the percentage of verdicts in "financial injury" cases that include a punitive damage award, from 15.8% in the early 1980s to 12.7% in the early 1990s). But see Punitive Damages: Empirical Findings 9 (finding an increase in the percentage of civil trials resulting in punitive damage awards in San Francisco and Cook Counties between 1960 and 1984).

One might posit that ill effects of punitive damages are clearest not in actual awards but in the shadow that the punitive regime casts on settlement negotiations and other litigation decisions. See, *e.g.,* Financial Injury Jury Verdicts 287; Polinsky, Are Punitive Damages Really Insignificant, Predictable, and Rational? 26 J. Legal Studies 663, 664–671 (1997). But here again the data have not established a clear correlation. See, *e.g.,* Eaton, Mustard, & Talarico, The Effects of Seeking Punitive Damages on the Processing of Tort Claims, 34 J. Legal Studies 343, 357, 353–354, 365 (2005) (studying data from six Georgia counties and concluding that "the decision to seek punitive damages has no statistically significant impact" on "whether a case that was disposed was done so by trial or by some other procedure, including settlement," or "whether a case that was disposed by means other than a trial was more likely to have been settled"); Kritzer & Zemans, The Shadow of Punitives, 1998 Wis. L. Rev. 157, 160 (1998) (noting the theory that punitive damages cast a large shadow over settlement negotiations, but finding that "with perhaps one exception, what little systematic evidence we could find does not support the notion" (emphasis deleted)).

high ratio of punitive to compensatory damages is sub-
stantially greater than necessary to punish or deter.

The real problem, it seems, is the stark unpredictability
of punitive awards.  Courts of law are concerned with
fairness as consistency, and evidence that the median
ratio of punitive to compensatory awards falls within a
reasonable zone, or that punitive awards are infrequent,
fails to tell us whether the spread between high and low
individual awards is acceptable.  The available data sug-
gest it is not.  A recent comprehensive study of punitive
damages awarded by juries in state civil trials found a
median ratio of punitive to compensatory awards of just
0.62:1, but a mean ratio of 2.90:1 and a standard deviation
of 13.81.  Juries, Judges, and Punitive Damages 269.[16]
Even to those of us unsophisticated in statistics, the
thrust of these figures is clear: the spread is great, and the
outlier cases subject defendants to punitive damages that
dwarf the corresponding compensatories.  The distribution
of awards is narrower, but still remarkable, among puni-
tive damages assessed by judges: the median ratio is
0.66:1, the mean ratio is 1.60:1, and the standard devia-
tion is 4.54.  *Ibid.*  Other studies of some of the same data
show that fully 14% of punitive awards in 2001 were
greater than four times the compensatory damages, see
Cohen 5, with 18% of punitives in the 1990s more than
trebling the compensatory damages, see Ostrom, Rottman,
& Goerdt, A Step Above Anecdote: A Profile of the Civil

—————

[16] This study examined "the most representative sample of state court
trials in the United States," involving "tort, contract, and property
cases disposed of by trial in fiscal year 1991–1992 and then calendar
years 1996 and 2001.  The three separate data sets cover state courts of
general jurisdiction in a random sample of 46 of the 75 most populous
counties in the United States."  Juries, Judges, and Punitive Damages
267.  The information was "gathered directly" from state-court clerks'
offices and the study did "not rely on litigants or third parties to re-
port."  *Ibid.*

Jury in the 1990s, 79 Judicature 233, 240 (1996). And a study of "financial injury" cases using a different data set found that 34% of the punitive awards were greater than three times the corresponding compensatory damages. Financial Injury Jury Verdicts 333.

Starting with the premise of a punitive-damages regime, these ranges of variation might be acceptable or even desirable if they resulted from judges' and juries' refining their judgments to reach a generally accepted optimal level of penalty and deterrence in cases involving a wide range of circumstances, while producing fairly consistent results in cases with similar facts. Cf. *TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443, 457–458 (1993) (plurality opinion). But anecdotal evidence suggests that nothing of that sort is going on. One of our own leading cases on punitive damages, with a $4 million verdict by an Alabama jury, noted that a second Alabama case with strikingly similar facts produced "a comparable amount of compensatory damages" but "no punitive damages at all." See *Gore*, 517 U. S., at 565, n. 8. As the Supreme Court of Alabama candidly explained, "the disparity between the two jury verdicts . . . [w]as a reflection of the inherent uncertainty of the trial process." *BMW of North America, Inc.* v. *Gore,* 646 So. 2d 619, 626 (1994) *(per curiam).* We are aware of no scholarly work pointing to consistency across punitive awards in cases involving similar claims and circumstances.[17]

———————

[17] The Court is aware of a body of literature running parallel to anecdotal reports, examining the predictability of punitive awards by conducting numerous "mock juries," where different "jurors" are confronted with the same hypothetical case. See, *e.g.,* C. Sunstein, R. Hastie, J. Payne, D. Schkade, W. Viscusi, Punitive Damages: How Juries Decide (2002); Schkade, Sunstein, & Kahneman, Deliberating About Dollars: The Severity Shift, 100 Colum. L. Rev. 1139 (2000); Hastie, Schkade, & Payne, Juror Judgments in Civil Cases: Effects of Plaintiff's Requests and Plaintiff's Identity on Punitive Damage Awards, 23 Law & Hum. Behav. 445 (1999); Sunstein, Kahneman, &

### E

The Court's response to outlier punitive damages awards has thus far been confined by claims at the constitutional level, and our cases have announced due process standards that every award must pass. See, *e.g., State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 425 (2003); *Gore,* 517 U. S., at 574–575. Although "we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," *id.,* at 582, we have determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm,* 538 U. S., at 425; "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," *ibid.*

Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard. Our due process cases, on the contrary, have all involved awards subject in the first instance to state law. See, *e.g., id.,* at 414 (fraud and intentional infliction of emotional distress under Utah law); *Gore, supra,* at 563, and n. 3 (fraud under Alabama law); *TXO, supra,* at 452 (plurality opinion) (slander of title under West Virginia law); *Haslip*, 499 U. S., at 7 (fraud under Alabama law). These, as state-law cases, could provide no occasion to consider a "common-law standard of excessiveness,"

Schkade, Assessing Punitive Damages (with Notes on Cognition and Valuation in Law), 107 Yale L. J. 2071 (1998). Because this research was funded in part by Exxon, we decline to rely on it.

*Browning-Ferris Industries,* 492 U. S., at 279, and the only matter of federal law within our appellate authority was the constitutional due process issue.

Our review of punitive damages today, then, considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute. Whatever may be the constitutional significance of the unpredictability of high punitive awards, this feature of happenstance is in tension with the function of the awards as punitive, just because of the implication of unfairness that an eccentrically high punitive verdict carries in a system whose commonly held notion of law rests on a sense of fairness in dealing with one another. Thus, a penalty should be reasonably predictable in its severity, so that even Justice Holmes's "bad man" can look ahead with some ability to know what the stakes are in choosing one course of action or another. See The Path of the Law, 10 Harv. L. Rev. 457, 459 (1897). And when the bad man's counterparts turn up from time to time, the penalty scheme they face ought to threaten them with a fair probability of suffering in like degree when they wreak like damage. Cf. *Koon* v. *United States*, 518 U. S. 81, 113 (1996) (noting the need "to reduce unjustified disparities" in criminal sentencing "and so reach toward the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice"). The common sense of justice would surely bar penalties that reasonable people would think excessive for the harm caused in the circumstances.

### F

#### 1

With that aim ourselves, we have three basic approaches to consider, one verbal and two quantitative. As mentioned before, a number of state courts have settled on

criteria for judicial review of punitive-damages awards that go well beyond traditional "shock the conscience" or "passion and prejudice" tests. Maryland, for example, has set forth a nonexclusive list of nine review factors under state common law that include "degree of heinousness," "the deterrence value of [the award]," and "[w]hether [the punitive award] bears a reasonable relationship to the compensatory damages awarded." *Bowden* v. *Caldor, Inc.,* 350 Md. 4, 25–39, 710 A. 2d 267, 277–284 (1998). Alabama has seven general criteria, such as "actual or likely harm [from the defendant's conduct]," "degree of reprehensibility," and "[i]f the wrongful conduct was profitable to the defendant." *Green Oil Co.* v. *Hornsby,* 539 So. 2d 218, 223–224 (1989) (internal quotation marks omitted). But see *McClain* v. *Metabolife Int'l, Inc.,* 259 F. Supp. 2d 1225, 1236 (ND Ala. 2003) (noting but not deciding claim that post-trial review under *Green Oil* "is unconstitutionally vague and inadequate").

These judicial review criteria are brought to bear after juries render verdicts under instructions offering, at best, guidance no more specific for reaching an appropriate penalty. In Maryland, for example, which allows punitive damages for intentional torts and conduct characterized by "actual malice," *U. S. Gypsum Co.* v. *Mayor and City Council of Baltimore,* 336 Md. 145, 185, 647 A. 2d 405, 424–425 (1994), juries may be instructed that

> "An award for punitive damages should be:
>     "(1) In an amount that will deter the defendant and others from similar conduct.
>     "(2) Proportionate to the wrongfulness of the defendant's conduct and the defendant's ability to pay.
>     "(3) But not designed to bankrupt or financially destroy a defendant." Md. Pattern Jury Instr., Civil, No. 10:13 (4th ed. 2007).

In Alabama, juries are instructed to fix an amount after

considering "the character and degree of the wrong as shown by the evidence in the case, and the necessity of preventing similar wrongs." 1 Ala. Pattern Jury Instr., Civil, No. §23.21 (Supp. 2007).

These examples leave us skeptical that verbal formulations, superimposed on general jury instructions, are the best insurance against unpredictable outliers. Instructions can go just so far in promoting systemic consistency when awards are not tied to specifically proven items of damage (the cost of medical treatment, say), and although judges in the States that take this approach may well produce just results by dint of valiant effort, our experience with attempts to produce consistency in the analogous business of criminal sentencing leaves us doubtful that anything but a quantified approach will work. A glance at the experience there will explain our skepticism.

The points of similarity are obvious. "[P]unitive damages advance the interests of punishment and deterrence, which are also among the interests advanced by the criminal law." *Browning-Ferris Industries*, 492 U. S., at 275.[18] See also 1977 Restatement §908, Comment *a,* at 464 (purposes of punitive damages are "the same" as "that of a fine imposed after a conviction of a crime"); 18 U. S. C. §3553(a)(2) (requiring sentencing courts to consider, *inter*

_____

[18] This observation is not at odds with the holding in *Browning-Ferris,* that the Excessive Fines Clause of the Eighth Amendment does not apply to punitive damages. See *Browning-Ferris*, 492 U. S., at 275. That conclusion did not reject the punitive nature of the damages, see *ibid.,* but rested entirely upon our conviction that "the concerns that animate the Eighth Amendment" were about "plac[ing] limits on the steps a government may take against an individual," *ibid.* Thus the Clause "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." *Id.,* at 264. We noted the similarities of purpose between criminal penalties and punitive damages and distinguished the two on the basis of their differing levels of state involvement. See *id.,* at 275.

*alia,* "the need for the sentence imposed . . . to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct"); United States Sentencing Commission, Guidelines Manual §1A1.1, comment. (Nov. 2007).

It is instructive, then, that in the last quarter century federal sentencing rejected an "indeterminate" system, with relatively unguided discretion to sentence within a wide range, under which "similarly situated offenders were sentenced [to], and did actually serve, widely disparate sentences."[19]  Instead it became a system of detailed guidelines tied to exactly quantified sentencing results, under the authority of the Sentencing Reform Act of 1984, 18 U. S. C. §3551 *et seq.* (2000 ed. and Supp. V).

The importance of this for us is that in the old federal sentencing system of general standards the cohort of even the most seasoned judicial penalty-givers defied consistency.  Judges and defendants alike were "[l]eft at large, wandering in deserts of uncharted discretion," M. Frankel, Criminal Sentences: Law Without Order 7–8 (1973), which is very much the position of those imposing punitive damages today, be they judges or juries, except that they lack even a statutory maximum; their only restraint beyond a core sense of fairness is the due process limit.  This federal criminal law development, with its many state parallels, strongly suggests that as long "as there are no punitive-damages guidelines, corresponding to the federal and state sentencing guidelines, it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary." *Mathias* v. *Accor Economy Lodging, Inc.,* 347 F. 3d 672, 678 (CA7 2003).

---

[19] Nagel, Structuring Sentencing Discretion: The New Federal Sentencing Guidelines, 80 J. Crim. L. & C. 883, 895–899 (1990) (citing studies and congressional hearings).

2

This is why our better judgment is that eliminating unpredictable outlying punitive awards by more rigorous standards than the constitutional limit will probably have to take the form adopted in those States that have looked to the criminal-law pattern of quantified limits. One option would be to follow the States that set a hard dollar cap on punitive damages, see *supra,* at 22, a course that arguably would come closest to the criminal law, rather like setting a maximum term of years. The trouble is, though, that there is no "standard" tort or contract injury, making it difficult to settle upon a particular dollar figure as appropriate across the board. And of course a judicial selection of a dollar cap would carry a serious drawback; a legislature can pick a figure, index it for inflation, and revisit its provision whenever there seems to be a need for further tinkering, but a court cannot say when an issue will show up on the docket again. See, *e.g., Jones & Laughlin Steel Corp.* v. *Pfeifer*, 462 U. S. 523, 546–547 (1983) (declining to adopt a fixed formula to account for inflation in discounting future wages to present value, in light of the unpredictability of inflation rates and variation among lost-earnings cases).

The more promising alternative is to leave the effects of inflation to the jury or judge who assesses the value of actual loss, by pegging punitive to compensatory damages using a ratio or maximum multiple. See, *e.g.,* 2 ALI Enterprise Responsibility for Personal Injury: Reporters' Study 258 (1991) (hereinafter ALI Reporters' Study) ("[T]he compensatory award in a successful case should be the starting point in calculating the punitive award"); ABA, Report of Special Comm. on Punitive Damages, Section of Litigation, Punitive Damages: A Constructive Examination 64–66 (1986) (recommending a presumptive punitive-to-compensatory damages ratio). As the earlier canvass of state experience showed, this is the model

many States have adopted, see *supra,* at 22, and n. 12, and Congress has passed analogous legislation from time to time, as for example in providing treble damages in antitrust, racketeering, patent, and trademark actions, see 15 U. S. C. §§15, 1117 (2000 ed. and Supp. V); 18 U. S. C. §1964(c); 35 U. S. C. §284.[20]  And of course the potential relevance of the ratio between compensatory and punitive damages is indisputable, being a central feature in our due process analysis.  See, *e.g., State Farm,* 538 U. S., at 425; *Gore,* 517 U. S., at 580.

Still, some will murmur that this smacks too much of policy and too little of principle.  Cf. *Moviecolor Ltd.* v. *Eastman Kodak Co.,* 288 F. 2d 80, 83 (CA2 1961).  But the answer rests on the fact that we are acting here in the position of a common law court of last review, faced with a perceived defect in a common law remedy.  Traditionally, courts have accepted primary responsibility for reviewing punitive damages and thus for their evolution, and if, in the absence of legislation, judicially derived standards leave the door open to outlier punitive-damages awards, it is hard to see how the judiciary can wash its hands of a problem it created, simply by calling quantified standards legislative.  See *State Farm, supra,* at 438 (GINSBURG, J., dissenting) ("In a legislative scheme or a state high court's design to cap punitive damages, the handiwork in setting single-digit and 1-to-1 benchmarks could hardly be questioned"); 2 ALI Reporters' Study 257 (recommending adoption of ratio, "probably legislatively, although possibly judicially").

History certainly is no support for the notion that judges

---

[20] There are State counterparts of these federal statutes.  See, *e.g.,* Conn. Gen. Stat. §52–560 (2007) (cutting or destroying a tree intended for use as a Christmas tree punishable by a payment to the injured party of five times the tree's value); Mass. Gen. Laws, ch. 91, §59A (West 2006) (discharging crude oil into a lake, river, tidal water, or flats subjects a defendant to double damages in tort).

cannot use numbers. The 21-year period in the rule against perpetuities was a judicial innovation, see, *e.g., Cadell* v. *Palmer,* 1 Clark & Finnelly 372, 6 Eng. Rep. 956, 963 (H. L. 1833), and so were exact limitations periods for civil actions, sometimes borrowing from statutes, see C. Preston & G. Newsom, Limitation of Actions 241–242 (2d ed. 1943), but often without any statutory account to draw on, see, *e.g.,* 1 H. Wood, Limitations of Actions §1, p. 4 (4th ed. 1916). For more examples, see 1 W. Blackstone, Commentaries on the Laws of England 451 (1765) (listing other common law age cut-offs with no apparent statutory basis). And of course, adopting an admiralty-law ratio is no less judicial than picking one as an outer limit of constitutionality for punitive awards. See *State Farm, supra,* at 425.[21]

———————

[21] To the extent that JUSTICE STEVENS suggests that the very subject of remedies should be treated as congressional in light of the number of statutes dealing with remedies, see *post,* at 1–4 (opinion concurring in part and dissenting in part), we think modern-day maritime cases are to the contrary and support judicial action to modify a common law landscape largely of our own making. The character of maritime law as a mixture of statutes and judicial standards, "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules," *East River S. S. Corp.* v. *Transamerica Delaval Inc.*, 476 U. S. 858, 865 (1986), accounts for the large part we have taken in working out the governing maritime tort principles. See, *e.g., ibid.* ("recognizing products liability . . . as part of the general maritime law"); *American Export Lines, Inc.* v. *Alvez*, 446 U. S. 274 (1980) (recognizing cause of action for loss of consortium); *Moragne* v. *States Marine Lines, Inc.*, 398 U. S. 375 (1970) (recognizing cause of action for wrongful death). And for the very reason that our exercise of maritime jurisdiction has reached to creating new causes of action on more than one occasion, it follows that we have a free hand in dealing with an issue that is "entirely a remedial matter." *Id.,* at 382. The general observation we made in *United States* v. *Reliable Transfer Co.*, 421 U. S. 397, 409 (1975), when we abrogated the admiralty rule of divided damages in favor of proportional liability, is to the point here. It is urged "that the creation of a new rule of damages in maritime collision cases is a task for Congress and not for this Court. But the Judiciary

Although the legal landscape is well populated with examples of ratios and multipliers expressing policies of retribution and deterrence, most of them suffer from features that stand in the way of borrowing them as paradigms of reasonable limitations suited for application to

———————

has traditionally taken the lead in formulating flexible and fair remedies in the law maritime, and Congress has largely left to this Court the responsibility for fashioning the controlling rules of admiralty law" (internal quotation marks and footnote omitted). See also *Exxon Co., U. S. A.* v. *Sofec, Inc.*, 517 U. S. 830 (1996) (holding that proportional-liability rule applies only to defendants proximately causing an injury); *McDermott, Inc.* v. *AmClyde*, 511 U. S. 202 (1994) (adopting proportionate-fault rule for calculation of nonsettling maritime tort defendants' compensatory liability).

Indeed, the compensatory remedy sought in this case is itself entirely a judicial creation. The common law traditionally did not compensate purely economic harms, unaccompanied by injury to person or property. See K. Abraham, Forms and Functions of Tort Law 247–248 (3d ed. 2007); see, *e.g., Robins Dry Dock & Repair Co.* v. *Dahl*, 266 U. S. 449 (1925) (imposing rule in maritime context). But "[t]he courts have . . . occasionally created exceptions to the rule. Perhaps the most noteworthy involve cases in which there has been natural-resource damage for which no party seems to have a cause of action." Abraham, *supra,* at 249 (discussing *Union Oil Co.* v. *Oppen,* 501 F. 2d 558 (CA9 1974) (recognizing exception for commercial fishermen)). We raise the point not to express agreement or disagreement with the Ninth Circuit rule but to illustrate the entirely judge-made nature of the landscape we are surveying.

To be sure, "Congress retains superior authority in these matters," and "[i]n this era, an admiralty court should look primarily to these legislative enactments for policy guidance." *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 27 (1990). But we may not slough off our responsibilities for common law remedies because Congress has not made a first move, and the absence of federal legislation constraining punitive damages does not imply a congressional decision that there should be no quantified rule, cf. *Rapanos* v. *United States*, 547 U. S. 715, 749 (2006) (plurality opinion) (noting the Court's "oft-expressed skepticism towards reading the tea leaves of congressional inaction"). Where there is a need for a new remedial maritime rule, past precedent argues for our setting a judicially derived standard, subject of course to congressional revision. See, *e.g., Reliable Transfer, supra,* at 409.

this case. While a slim majority of the States with a ratio have adopted 3:1, others see fit to apply a lower one, see, *e.g.,* Colo. Rev. Stat. Ann. §13–21–102(1)(a) (2007) (1:1); Ohio Rev. Code Ann. §2315.21(D)(2)(a) (Lexis 2005) (2:1), and a few have gone higher, see, *e.g.,* Mo. Ann. Stat. §510.265(1) (Supp. 2008) (5:1). Judgments may differ about the weight to be given to the slight majority of 3:1 States, but one feature of the 3:1 schemes dissuades us from selecting it here. With a few statutory exceptions, generally for intentional infliction of physical injury or other harm, see, *e.g,* Ala. Code §6–11–21(j) (2005); Ark. Code Ann. §16–55–208(b) (2005), the States with 3:1 ratios apply them across the board (as do other States using different fixed multipliers). That is, the upper limit is not directed to cases like this one, where the tortious action was worse than negligent but less than malicious,[22] exposing the tortfeasor to certain regulatory sanctions and inevitable damage actions;[23] the 3:1 ratio in these States also applies to awards in quite different cases involving some of the most egregious conduct, including malicious behavior and dangerous activity carried on for the purpose of increasing a tortfeasor's financial gain.[24] We confront,

_____

[22]Although the jury heard evidence that Exxon may have felt constrained not to give Hazelwood a shoreside assignment because of a concern that such a course might open it to liabilities in personnel litigation the employee might initiate, see, *e.g.,* App. F to Pet. for Cert. 256a, such a consideration, if indeed it existed, hardly constitutes action taken with a specific purpose to cause harm at the expense of an established duty.

[23]We thus treat this case categorically as one of recklessness, for that was the jury's finding. But by making a point of its contrast with cases falling within categories of even greater fault we do not mean to suggest that Exxon's and Hazelwood's failings were less than reprehensible.

[24]Two of the States with 3:1 ratios do provide for slightly larger awards in actions involving this type of strategic financial wrongdoing, but the exceptions seem to apply to only a subset of those cases. See Alaska Stat. §09.17.020(g) (2006) (where the defendant's conduct was

instead, a case of reckless action, profitless to the tortfea-sor, resulting in substantial recovery for substantial injury. Thus, a legislative judgment that 3:1 is a reasonable limit overall is not a judgment that 3:1 is a reasonable limit in this particular type of case.

For somewhat different reasons, the pertinence of the 2:1 ratio adopted by treble-damages statutes (offering compensatory damages plus a bounty of double that amount) is open to question. Federal treble-damages statutes govern areas far afield from maritime concerns (not to mention each other);[25] the relevance of the governing rules in patent or trademark cases, say, is doubtful at best. And in some instances, we know that the considerations that went into making a rule have no application here. We know, for example, that Congress devised the treble damages remedy for private antitrust actions with an eye to supplementing official enforcement by inducing private litigation, which might otherwise have been too rare if nothing but compensatory damages were available at the end of the day. See, *e.g., Reiter*, 442 U. S., at 344. That concern has no traction here, in this case of stagger-

---

motivated by financial gain and the adverse consequences of the conduct were actually known by the defendant or the person responsible for making policy decisions on behalf of the defendant, the normal limit is replaced by the greater of four times the compensatory damages, four times the aggregate financial gain the defendant received as a result of its misconduct, or $7 million); Fla. Stat. §§768.73(1)(b), (c) (2007) (normal limit replaced by greater of 4:1 or $2 million where defendant's wrongful conduct was motivated solely by unreasonable financial gain and the unreasonably dangerous nature of the conduct, together with the high likelihood of injury, was actually known by the managing agent, director, officer, or other person responsible for making policy decisions on behalf of the defendant).

[25] See, *e.g.,* 15 U. S. C. §15 (antitrust); 18 U. S. C. §1964 (racketeering); 35 U. S. C. §284 (patent); 15 U. S. C. §1117 (trademark) (2000 ed. and Supp. V); 7 U. S. C. §2564 (plant variety protections); 12 U. S. C. §2607 (real estate settlement antikickback provision); 15 U. S. C. §1693f (consumer credit protection).

ing damage inevitably provoking governmental enforcers to indict and any number of private parties to sue. To take another example, although 18 U. S. C. §3571(d) provides for a criminal penalty of up to twice a crime victim's loss, this penalty is an alternative to other specific fine amounts which courts may impose at their option, see §§3571(a)–(c), a fact that makes us wary of reading too much into Congress's choice of ratio in one provision. State environmental treble-damages schemes offer little more support: for one thing, insofar as some appear to punish even negligence, see, *e.g.,* Mass. Gen. Laws, ch. 130, §27, while others target only willful conduct, see, *e.g.,* Del. Code Ann., Tit. 25, §1401 (1989), some undershoot and others may overshoot the target here. For another, while some States have chosen treble damages, others punish environmental harms at other multiples. See, *e.g.,* N. H. Rev. Stat. Ann. §146–A:10 (2005) (damages of one-and-a-half times the harm caused to private property by oil discharge); Minn. Stat. Ann. §115A.99 (2005) (civil penalty of 2 to 5 times the costs of removing unlawful solid waste). All in all, the legislative signposts do not point the way clearly to 2:1 as a sound indication of a reasonable limit.

3

There is better evidence of an accepted limit of reasonable civil penalty, however, in several studies mentioned before, showing the median ratio of punitive to compensatory verdicts, reflecting what juries and judges have considered reasonable across many hundreds of punitive awards. See *supra,* at 25–26, and n. 14. We think it is fair to assume that the greater share of the verdicts studied in these comprehensive collections reflect reasonable judgments about the economic penalties appropriate in their particular cases.

These studies cover cases of the most as well as the least

blameworthy conduct triggering punitive liability, from malice and avarice, down to recklessness, and even gross negligence in some jurisdictions. The data put the median ratio for the entire gamut of circumstances at less than 1:1, see *supra,* at 25–26, and n. 14, meaning that the compensatory award exceeds the punitive award in most cases. In a well-functioning system, we would expect that awards at the median or lower would roughly express jurors' sense of reasonable penalties in cases with no earmarks of exceptional blameworthiness within the punishable spectrum (cases like this one, without intentional or malicious conduct, and without behavior driven primarily by desire for gain, for example) and cases (again like this one) without the modest economic harm or odds of detection that have opened the door to higher awards. It also seems fair to suppose that most of the unpredictable outlier cases that call the fairness of the system into question are above the median; in theory a factfinder's deliberation could go awry to produce a very low ratio, but we have no basis to assume that such a case would be more than a sport, and the cases with serious constitutional issues coming to us have naturally been on the high side, see, *e.g., State Farm*, 538 U. S., at 425 (ratio of 145:1); *Gore*, 517 U. S., at 582 (ratio of 500:1). On these assumptions, a median ratio of punitive to compensatory damages of about 0.65:1[26] probably marks the line near which cases like this one largely should be grouped. Accordingly, given the need to protect against the possibility (and the disruptive cost to the legal system) of awards that are unpredictable and unnecessary, either for deterrence or for measured retribution, we consider that a 1:1 ratio, which is above the median award, is a fair upper limit in such maritime cases.[27]

---

[26] See *supra,* at 25, n. 14, for the spread among studies.

[27] The reasons for this conclusion answer JUSTICE STEVENS's sugges-

The provision of the CWA respecting daily fines confirms our judgment that anything greater would be exces-

———————

tion, *post,* at 7–8, that there is an adequate restraint in appellate abuse-of-discretion review of a trial judge's own review of a punitive jury award (or of a judge's own award in nonjury cases). We cannot see much promise of a practical solution to the outlier problem in this possibility. JUSTICE STEVENS would find no abuse of discretion in allowing the $2.5 billion balance of the jury's punitive verdict here, and yet that is about five times the size of the award that jury practice and our judgment would signal as reasonable in a case of this sort.

The dissent also suggests that maritime tort law needs a quantified limit on punitive awards less than tort law generally because punitives may mitigate maritime law's less generous scheme of compensatory damages. *Post,* at 4–6. But the instructions in this case did not allow the jury to set punitives on the basis of any such consideration, see Jury Instruction No. 21, App. to Brief in Opposition 12a ("The purposes for which punitive damages are awarded are: (1) to punish a wrongdoer for extraordinary misconduct; and (2) to warn defendants and others and deter them from doing the same"), and the size of the underlying compensatory damages does not bespeak economic inadequacy; the case, then, does not support an argument that maritime compensatory awards need supplementing.

And this Court has long held that "[p]unitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor . . . and to deter him and others from similar extreme conduct." *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 266–267 (1981); see *supra,* at 18–19. Indeed, any argument for more generous punitive damages in maritime cases would call into question the maritime applicability of the constitutional limit on punitive damages as now understood, for we have tied that limit to a conception of punitive damages awarded entirely for a punitive, not quasi-compensatory, purpose. See, *e.g., Philip Morris USA* v. *Williams,* 549 U. S. 346, 352 (2007) ("This Court has long made clear that '[p]unitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition'" (quoting *Gore,* 517 U. S., at 568)); *State Farm,* 538 U. S., at 416 ("[P]unitive damages . . . are aimed at deterrence and retribution"); *Cooper Industries,* 532 U. S., at 432 ("[C]ompensatory damages and punitive damages . . . serve distinct purposes. The former are intended to redress the concrete loss that the plaintiff has suffered . . . . The latter . . . operate as 'private fines' intended to punish the defendant and to deter future wrongdoing").

sive here and in cases of this type. Congress set criminal penalties of up to $25,000 per day for negligent violations of pollution restrictions, and up to $50,000 per day for knowing ones. 33 U. S. C. §§1319(c)(1), (2). Discretion to double the penalty for knowing action compares to discretion to double the civil liability on conduct going beyond negligence and meriting punitive treatment. And our explanation of the constitutional upper limit confirms that the 1:1 ratio is not too low. In *State Farm,* we said that a single-digit maximum is appropriate in all but the most exceptional of cases, and "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." 538 U. S., at 425.[28]

V

Applying this standard to the present case, we take for granted the District Court's calculation of the total relevant compensatory damages at $507.5 million. See *In re Exxon Valdez,* 236 F. Supp. 2d 1043, 1063 (D. Alaska 2002). A punitive-to-compensatory ratio of 1:1 thus yields maximum punitive damages in that amount.

We therefore vacate the judgment and remand the case for the Court of Appeals to remit the punitive damages award accordingly.

*It is so ordered.*

JUSTICE ALITO took no part in the consideration or decision of this case.

---

[28] The criterion of "substantial" takes into account the role of punitive damages to induce legal action when pure compensation may not be enough to encourage suit, a concern addressed by the opportunity for a class action when large numbers of potential plaintiffs are involved: in such cases, individual awards are not the touchstone, for it is the class option that facilitates suit, and a class recovery of $500 million is substantial. In this case, then, the constitutional outer limit may well be 1:1.

# SUPREME COURT OF THE UNITED STATES

———————

No. 07–219

———————

## EXXON SHIPPING COMPANY, ET AL., PETITIONERS *v.* GRANT BAKER ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2008]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court, including the portions that refer to constitutional limits that prior opinions have imposed upon punitive damages. While I agree with the argumentation based upon those prior holdings, I continue to believe the holdings were in error. See *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 429 (2003) (SCALIA, J., dissenting).

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–219

EXXON SHIPPING COMPANY, ET AL., PETITIONERS *v.* GRANT BAKER ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2008]

JUSTICE STEVENS, concurring in part and dissenting in part.

While I join Parts I, II, and III of the Court's opinion, I believe that Congress, rather than this Court, should make the empirical judgments expressed in Part IV. While maritime law "'is judge-made law to a great extent,'" *ante,* at 16 (quoting *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256, 259 (1979)), it is also statutory law to a great extent; indeed, "[m]aritime tort law is now dominated by federal statute." *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 36 (1990). For that reason, when we are faced with a choice between performing the traditional task of appellate judges reviewing the acceptability of an award of punitive damages, on the one hand, and embarking on a new lawmaking venture, on the other, we "should carefully consider whether [we], or a legislative body, are better equipped to perform the task at hand." *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 531 (1988) (STEVENS, J., dissenting).

Evidence that Congress has affirmatively chosen *not* to restrict the availability of a particular remedy favors

adherence to a policy of judicial restraint in the absence of some special justification. The Court not only fails to offer any such justification, but also ignores the particular features of maritime law that may counsel against imposing the sort of limitation the Court announces today. Applying the traditional abuse-of-discretion standard that is well grounded in the common law, I would affirm the judgment of the Court of Appeals.

## I

As we explained in *Miles* v. *Apex Marine Corp.*, 498 U. S., at 27, "an admiralty court must be vigilant not to overstep the well-considered boundaries imposed by federal legislation." In light of the many statutes governing liability under admiralty law, the absence of any limitation on an award of the sort at issue in this case suggests that Congress would *not* wish us to create a new rule restricting the liability of a wrongdoer like Exxon.

For example, the Limitation of Shipowners' Liability Act (Limitation Act), 46 U. S. C. App. §183[1], a statute that has been part of the fabric of our law since 1851, provides in relevant part:

> "The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put onboard of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners*, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." §183(a)

---

[1] The Limitation Act is now codified as amended at 46 U. S. C. §30505. See Pub. L. 109–304, §3, 120 Stat. 1513.

(emphasis added).

This statute operates to shield from liability shipowners charged with wrongdoing committed without their privity or knowledge; the Limitation Act's protections thus render large punitive damages awards functionally unavailable in a wide swath of admiralty cases.[2] Exxon evidently did not invoke the protection of the Limitation Act because it recognized the futility of attempting to establish that it lacked "privity or knowledge" of Captain Hazelwood's drinking.[3] Although the existence of the Limitation Act does not resolve this case, the fact that Congress chose to provide such generous protection against liability without including a party like Exxon within that protection counsels against extending a similar benefit here.

The Limitation Act is only one of several statutes that point to this conclusion. In the Trans-Alaska Pipeline Authorization Act (TAPAA), 87 Stat. 584, 43 U. S. C. §1651 *et seq.*, Congress altered the liability regime governing certain types of Alaskan oil spills, imposing strict liability but also capping recovery; notably, it did not

---

[2] See *Lewis* v. *Lewis & Clark Marine, Inc.*, 531 U. S. 438, 446 (2001) ("Admiralty and maritime law includes a host of special rights, duties, rules, and procedures. . . . Among these provisions is the Limitation Act. . . . The Act allows a vessel owner to limit liability for damage or injury, occasioned without the owner's privity or knowledge, to the value of the vessel or the owner's interest in the vessel"); *Coryell* v. *Phipps*, 317 U. S. 406, 412 (1943) ("One who selects competent men to store and inspect a vessel and who is not on notice as to the existence of any defect cannot be denied the benefit of the limitation as respects a loss incurred by an explosion during the period of storage, unless 'privity' or 'knowledge' are to become empty words").

[3] Testimony at an early phase of this protracted litigation confirmed as much. In a hearing before the District Court, one of Exxon's attorneys explained that his firm advised Exxon in 1989 that Exxon would "'never be able to sustain its burden to show lack of privity or knowledge with the use of alcohol by Captain Hazelwood.'" App. to Brief in Opposition 43a.

restrict the availability of punitive damages.[4]    (Exxon
unsuccessfully argued that the TAPAA precluded punitive
damages at an earlier stage of this litigation, see App.
101–107.)   And the Court today rightly decides that in
passing the Clean Water Act, Congress did not displace or
in any way diminish the availability of common-law puni-
tive damages remedies.  *Ante,* at 14–15.

The congressional choice not to limit the availability of
punitive damages under maritime law should not be
viewed as an invitation to make policy judgments on the
basis of evidence in the public domain that Congress is
better able to evaluate than is this Court.

## II

The Court's analysis of the empirical data it has assem-
bled is problematic for several reasons.  First, I believe
that the Court fails to recognize a unique feature of mari-
time law that may counsel against uncritical reliance on
data from land-based tort cases: General maritime law
limits the availability of compensatory damages.  Some
maritime courts bar recovery for negligent infliction of
purely emotional distress, see 1 T. Schoenbaum, Admi-

---

[4] Although the issue has not been resolved by this Court, there is
evidence that in passing TAPAA, Congress meant to prevent applica-
tion of the Limitation Act to the trans-Alaskan transportation of oil.
The House Conference Report includes the following passage:

"Under the Limitation of Liability Act of 1851 (46 U. S. C. 183), the
owner of a vessel is entitled to limit his liability for property damage
caused by the vessel. . . The Conferees concluded that existing maritime
law would not provide adequate compensation to all victims . . . in the
event of the kind of catastrophe which might occur.  Consequently, the
Conferees established a rule of strict liability for damages from dis-
charges of the oil transported through the trans-Alaska Pipeline up to
$100,000,000."  H. R. Conf. Rep. No. 93–624, p. 28 (1973).

See also *In re Glacier Bay,* 944 F. 2d 577, 583 (CA9 1991) ("[W]e hold
that TAPAA implicitly repealed the Limitation Act with regard to the
transportation of trans-Alaska oil").

ralty and Maritime Law §5–15 (4th ed. 2004),[5] and, on the view of many courts, maritime law precludes recovery for purely "economic losses . . . absent direct physical damage to property or a proprietary interest," 2 *id.,* §14–7, at 124.[6] Under maritime law, then, more than in the land-tort context, punitive damages may serve to compensate for certain sorts of intangible injuries not recoverable under the rubric of compensation.

We observed in *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.*, 532 U. S. 424, 437–438, n. 11 (2001):

> "Until well into the 19th century, punitive damages frequently operated to compensate for intangible injuries, compensation which was not otherwise available under the narrow conception of compensatory damages prevalent at the time. . . .  As the types of compensatory damages available to plaintiffs have broadened, see, *e.g.,* 1 J. Nates, C. Kimball, D. Axelrod, & R. Goldstein, Damages in Tort Actions §3.01[3][a](2000) (pain and suffering are generally available as species of compensatory damages), the theory behind punitive damages has shifted toward a more purely punitive

---

[5] Schoenbaum explains that "[n]either the general maritime law nor the Jones Act recognizes a right to recover damages for negligent infliction of emotional distress unaccompanied by physical injury." §5–15, p. 239.  See also *Gough* v. *Natural Gas Pipeline Co. of Am.,* 996 F. 2d 763, 765 (CA5 1993) (purely emotional injuries are compensable under maritime law when maritime plaintiffs "satisfy the 'physical injury or impact rule'").

[6] The latter limitation has its roots in the "dry dock doctrine" of *Robins Dry Dock & Repair Co.* v. *Flint*, 275 U. S. 303 (1927) (opinion for the Court by Holmes, J.).  See *Barber Lines A/S* v. *M/V Donau Maru,* 764 F. 2d 50 (CA1 1985) (opinion for the Court by Breyer, J.) (tracing the history and purposes of the doctrine, and resolving to adhere to its rule); see also *Louisiana* v. *M/V Testbank,* 752 F. 2d 1019, 1020 (CA5 1985) (en banc) (affirming rule denying recovery for economic loss absent "physical damage to a proprietary interest . . . in cases of unintentional maritime tort").

. . . understanding."

Although these sorts of intangible injuries are now largely a species of ordinary compensatory damages under general tort law, it appears that maritime law continues to treat such injuries as less than fully compensable, or not compensable at all. Accordingly, there may be less reason to limit punitive damages in this sphere than there would be in any other.

Second, both caps and ratios of the sort the Court relies upon in its discussion are typically imposed by legislatures, not courts. Although the Court offers a great deal of evidence that States have acted in various ways to limit punitive damages, it is telling that the Court fails to identify a single state *court* that has imposed a precise ratio, as the Court does today, under its common-law authority. State legislatures have done so, of course; and indeed Congress would encounter no obstacle to doing the same as a matter of federal law. But Congress is far better situated than is this Court to assess the empirical data, and to balance competing policy interests, before making such a choice.[7]

--------

[7] See *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 665–666 (1994) (plurality opinion) ("As an institution . . . Congress is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon an issue as complex and dynamic as that presented here" (internal quotation marks omitted)); *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 513 (1982) (when "relevant policy considerations do not invariably point in one direction, and there is vehement disagreement over the validity of the assumptions underlying many of them[, t]he very difficulty of these policy considerations, and Congress' superior institutional competence to pursue this debate, suggest that legislative not judicial solutions are preferable").

The Court points to *United States* v. *Reliable Transfer Co.*, 421 U. S. 397 (1975), a case in which the Court adopted a rule of proportional liability in maritime tort cases, as an illustrative example of the Court's power to craft "flexible and fair remedies in the law maritime." *Id.,* at 409. In that case, however, the Court noted that not only was the new

The Court concedes that although "American punitive damages have been the target of audible criticism in recent decades," "most recent studies tend to undercut much of [that criticism]." *Ante,* at 24. It further acknowledges that "[a] survey of the literature reveals that discretion to award punitive damages has not mass-produced runaway awards." *Ibid.* The Court concludes that the real problem is large *outlier* awards, and the data seem to bear this out. But the Court never explains why abuse-of-discretion review is not the precise antidote to the unfairness inherent in such excessive awards.

Until Congress orders us to impose a rigid formula to govern the award of punitive damages in maritime cases, I would employ our familiar abuse-of-discretion standard: "If no constitutional issue is raised, the role of the appellate court, at least in the federal system, is merely to review the trial court's 'determination under an abuse-of-discretion standard,'" *Cooper Industries, Inc.,* 532 U. S., at 433; see also *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 15 (1991) ("Under the traditional common-law approach, the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct. The jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable").

On an abuse-of-discretion standard, I am persuaded that a reviewing court should not invalidate this award.[8]

———————

proportional liability rule not barred by any "statutory or judicial precept," but also that its adoption would "simply bring recovery for property damage in maritime collision cases into line with the rule of admiralty law long since established by Congress for personal injury cases." *Ibid.* By contrast, the Court in this case has failed to demonstrate that adoption of the rule it announces brings the maritime law into line with expressions of congressional intent in this (or any other) context.

[8] The idiosyncratic posture of this case makes true abuse-of-discretion appellate review something of a counterfactual, since the $5 billion

In light of Exxon's decision to permit a lapsed alcoholic to command a supertanker carrying tens of millions of gallons of crude oil through the treacherous waters of Prince William Sound, thereby endangering all of the individuals who depended upon the sound for their livelihoods, the jury could reasonably have given expression to its "moral condemnation" of Exxon's conduct in the form of this award. *Cooper Industries, Inc.,* 532 U. S., at 432.

I would adhere to the principle that "'it better becomes the humane and liberal character of proceedings in admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.'" *Moragne* v. *States Marine Lines, Inc.,* 398 U. S. 375, 387 (1970) (quoting Chief Justice Chase in *The Sea Gull,* 21 F. Cas. 909, 910 (CC Md. 1865)).

* * *

While I do not question that the Court possesses the power to craft the rule it announces today, in my judgment it errs in doing so. Accordingly, I respectfully dissent from Parts IV and V of the Court's opinion, and from its judgment.

---

award returned by the jury was, after several intervening steps, ultimately remitted to $2.5 billion by the Ninth Circuit in order to conform with this Court's Due Process cases. 472 F. 3d 600 (2006) *(per curiam).* Suffice it to say, for now, that although the constitutional limits and the abuse-of-discretion standard are not identical, in this case the $2.5 billion the Ninth Circuit believed survived *de novo* constitutional scrutiny would, in my judgment, also satisfy abuse-of-discretion review.

# SUPREME COURT OF THE UNITED STATES

No. 07–219

EXXON SHIPPING COMPANY, ET AL., PETITIONERS *v.*
GRANT BAKER ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2008]

JUSTICE GINSBURG, concurring in part and dissenting in part.

I join Parts I, II, and III of the Court's opinion, and dissent from Parts IV and V.

This case is unlike the Court's recent forays into the domain of state tort law under the banner of substantive due process. See *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 418–428 (2003) (reining in state-court awards of punitive damages); *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 574–585 (1996) (same). The controversy here presented "arises under federal maritime jurisdiction," *ante*, at 28 (opinion of the Court), and, beyond question, "the Court possesses the power to craft the rule it announces today," *ante*, at 8 (STEVENS, J., concurring in part and dissenting in part). The issue, therefore, is whether the Court, though competent to act, should nevertheless leave the matter to Congress. The Court has explained, in its well stated and comprehensive opinion, why it has taken the lead. While recognizing that the question is close, I share JUSTICE STEVENS' view that Congress is the better equipped decisionmaker.

First, I question whether there is an urgent need in maritime law to break away from the "traditional common-law approach" under which punitive damages are determined by a properly instructed jury, followed by trial-

court, and then appellate-court review, to ensure that [the award] is reasonable." *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1, 15 (1991). The Court acknowledges that the traditional approach "has not mass-produced runaway awards," *ante,* at 24, or endangered settlement negotiations, *ante,* at 25, n. 15. Nor has the Court asserted that outlier awards, insufficiently checked by abuse-of-discretion review, occur more often or are more problematic in maritime cases than in other areas governed by federal law.

Second, assuming a problem in need of solution, the Court's lawmaking prompts many questions. The 1:1 ratio is good for this case, the Court believes, because Exxon's conduct ranked on the low end of the blameworthiness scale: Exxon was not seeking "to augment profit," nor did it act "with a purpose to injure," *ante*, at 20. What ratio will the Court set for defendants who acted maliciously or in pursuit of financial gain? See *ante*, at 37–38. Should the magnitude of the risk increase the ratio and, if so, by how much? Horrendous as the spill from the *Valdez* was, millions of gallons more might have spilled as a result of Captain Hazelwood's attempt to rock the boat off the reef. See *ante*, at 4 (opinion of the Court); cf. *TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443, 460–462 (1993) (plurality opinion) (using potential loss to plaintiff as a guide in determining whether jury verdict was excessive). In the end, is the Court holding only that 1:1 is the maritime-law ceiling, or is it also signaling that any ratio higher than 1:1 will be held to exceed "the constitutional outer limit"? See *ante*, at 42, n. 28. On next opportunity, will the Court rule, definitively, that 1:1 is the ceiling due process requires in all of the States, and for all federal claims?

Heightening my reservations about the 1:1 solution is JUSTICE STEVENS' comment on the venturesome character of the Court's decision. In the States, he observes, fixed

ratios and caps have been adopted by legislatures; this Court has not identified "[any] state *court* that has imposed a precise ratio" in lieu of looking to the legislature as the appropriate source of a numerical damage limitation. *Ante*, at 6.

\*    \*    \*

For the reasons stated, I agree with JUSTICE STEVENS that the new law made by the Court should have been left to Congress. I would therefore affirm the judgment of the Court of Appeals.

# SUPREME COURT OF THE UNITED STATES

No. 07–219

EXXON SHIPPING COMPANY, ET AL., PETITIONERS *v.*
GRANT BAKER ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2008]

JUSTICE BREYER, concurring in part and dissenting in part.

I join Parts I, II, and III of the Court's opinion. But I disagree with its conclusion in Parts IV and V that the punitive damages award in this case must be reduced.

Like the Court, I believe there is a need, grounded in the rule of law itself, to assure that punitive damages are awarded according to meaningful standards that will provide notice of how harshly certain acts will be punished and that will help to assure the uniform treatment of similarly situated persons. See *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 587 (1996) (BREYER, J., concurring). Legal standards, however, can secure these objectives without the rigidity that an absolute fixed numerical ratio demands. In setting forth constitutional due process limits on the size of punitive damages awards, for example, we said that "*few* awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm Mut. Automobile Ins. Co.* v. *Campbell*, 538 U. S. 408, 425 (2003) (emphasis added). We thus foresaw exceptions to the numerical constraint.

In my view, a limited exception to the Court's 1:1 ratio is warranted here. As the facts set forth in Part I of the Court's opinion make clear, this was no mine-run case of

reckless behavior. The jury could reasonably have believed that Exxon knowingly allowed a relapsed alcoholic repeatedly to pilot a vessel filled with millions of gallons of oil through waters that provided the livelihood for the many plaintiffs in this case. Given that conduct, it was only a matter of time before a crash and spill like this occurred. And as JUSTICE GINSBURG points out, the damage easily could have been much worse. See *ante*, at 2.

The jury thought that the facts here justified punitive damages of $5 billion. See *ante*, at 6 (opinion of the Court). The District Court agreed. It "engaged in an exacting review" of that award "not once or twice, but three times, with a more penetrating inquiry each time," the case having twice been remanded for reconsideration in light of Supreme Court due process cases that the District Court had not previously had a chance to consider. 296 F. Supp. 2d 1071, 1110 (D. Alaska 2004). And each time it concluded "that a $5 billion award was justified by the facts of this case," based in large part on the fact that "Exxon's conduct was highly reprehensible," and it reduced the award (slightly) only when the Court of Appeals specifically demanded that it do so. *Ibid.;* see also *id.,* at 1075.

When the Court of Appeals finally took matters into its own hands, it concluded that the facts justified an award of $2.5 billion. See 472 F. 3d 600, 625 (CA9 2006) *(per curiam).* It specifically noted the "egregious" nature of Exxon's conduct. *Ibid.* And, apparently for that reason, it believed that the facts of the case "justifie[d] a considerably higher ratio" than the 1:1 ratio we had applied in our most recent due process case and that the Court adopts here. *Ibid.*

I can find no reasoned basis to disagree with the Court of Appeals' conclusion that this is a special case, justifying an exception from strict application of the majority's numerical rule. The punitive damages award before us

already represents a 50% reduction from the amount that the District Court strongly believed was appropriate. I would uphold it.