PRO, District Judge,
concurring:
The Native Village of Kivalina and the City of Kivalina (together “Kivalina”) appeal the district court’s dismissal of their federal common law public nuisance claim for damages against Appellees, who are oil, energy, and utility companies. In support of their federal common law nuisance claim, Kivalina alleges Appellees emit massive amounts of greenhouse gases that contribute to global warming which, in turn, has severely eroded the land where the City of Kivalina sits and threatens it with imminent destruction. Kivalina also brought conspiracy and concert of action claims which are dependent on their federal common law nuisance claim. Additionally, Kivalina brought a state law nuisance claim in the alternative to their federal common law claim. The district court dismissed the state law nuisance claim without prejudice to refiling in state court, and no one appeals that decision. Consequently, the question before us is whether Kivalina states a viable federal common law public nuisance claim for damages.
The majority opinion holds that the Clean Air Act (“CAA”) and the Environmental Protection Agency (“EPA”) action the Act authorizes displace Kivalina’s claims. I write separately to address what I view as tension in Supreme Court authority on whether displacement of a claim for injunctive relief necessarily calls for displacement of a damages claim, and to more fully explain why I concur in the majority opinion’s ultimate conclusion. I also write separately to express my view that Kivalina lacks standing.
*859 I.
A.
“[F]ederal common law addresses subjects within national legislative power where Congress has so directed or where the basic scheme of the Constitution so demands.” Am. Elec. Power Co., Inc. v. Connecticut (“AEP”), — U.S. -, 131 S.Ct. 2527, 2535, 180 L.Ed.2d 435 (2011) (internal quotation marks and citation omitted). Among the subjects which may call for application of federal common law is environmental protection, particularly issues involving “air and water in their ambient or interstate aspects.” Id. (citation omitted).
However, once Congress addresses a question previously answered by resort to federal common law, the federal common law is displaced. Id. at 2537. A federal statute displaces federal common law whenever a “legislative scheme [speaks] directly to a question.” City of Milwaukee v. Illinois (‘Milwaukee IP), 451 U.S. 304, 315, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981). To determine whether a legislative enactment directly speaks to the question at issue, the reviewing court must “assess[] the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law.” Id. at 315 n. 8, 101 S.Ct. 1784. This analysis begins with the assumption that Congress, not the federal courts, sets out the “appropriate standards to be applied as a matter of federal law.” Id. at 317, 101 S.Ct. 1784.
The law of federal displacement is easily stated, but best understood by examination of its application through a series of Supreme Court cases beginning with Illinois v. City of Milwaukee (“Milwaukee I”), 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). In Mihvaukee I, the State of Illinois brought a federal common law nuisance abatement suit under the Supreme Court’s original jurisdiction against four cities and two sewage commissions located in Wisconsin, alleging the defendants were polluting Lake Michigan. 406 U.S. at 93, 92 S.Ct. 1385. After determining it had jurisdiction over the action, the Supreme Court evaluated federal statutory law governing interstate water pollution. Id. at 101-03, 92 S.Ct. 1385. Specifically, the Supreme Court noted that the Rivers and Harbors Act of March 3, 1899 granted the Army Corps of Engineers some power to oversee industrial pollution, the Federal Water Pollution Control Act “tighten[ed] control over discharges into navigable waters so as not to lower applicable water quality standards,” the National Environmental Policy Act of 1969 directed federal governmental agencies to evaluate environmental issues in agency decision making, and the Fish and Wildlife Act of 1956 and Fish and Wildlife Coordination Act reflected Congress’s “increasing concern with the quality of the aquatic environment as it affects the conservation and safeguarding of fish and wildlife resources.” Id. at 101-02, 92 S.Ct. 1385.
The Supreme Court gave special attention to the Federal Water Pollution Control Act (“FWPCA”), which provided that while the primary responsibility for preventing and controlling water pollution lay with the States, “federal, not state, law ... in the end controls the pollution of interstate or navigable waters.” Id. at 102, 92 S.Ct. 1385. The FWPCA included procedures for abatement of pollution if a State failed to act, including a potential suit by the Attorney General. Id. at 102-03, 92 S.Ct. 1385. The Supreme Court nevertheless found that none of the identified enactments displaced Illinois’s federal common law public nuisance claim, in part because the FWPCA specifically provided that there was no intent to displace state or interstate actions to abate water pollu *860 tion with federal enforcement actions. Id. at 104, 92 S.Ct. 1385. The Supreme Court nevertheless declined to hear the case in its original jurisdiction, instead directing Illinois to bring the action in federal district court. Id. at 108, 92 S.Ct. 1385.
In Milwaukee I, the Supreme Court acknowledged that “LOt may happen that new federal laws and new federal regulations may in time pre-empt the field of federal common law of nuisance.” Id. at 107, 92 S.Ct. 1385. This prediction was realized in Milwaukee II. Following the Supreme Court’s suggestion in Milwaukee I, Illinois re-filed its federal common law nuisance abatement suit in federal district court. Milwaukee II, 451 U.S. at 310, 101 S.Ct. 1784. Congress thereafter enacted the Federal Water Pollution Control Act Amendments of 1972, also known as the Clean Water Act (“CWA”). Id. Under the amendments, it was “illegal for anyone to discharge pollutants into the Nation’s waters except pursuant to a permit.” Id. at 310-11, 101 S.Ct. 1784 (citing 33 U.S.C. §§ 1311, 1342). The EPA was charged with administering the Act, and to the extent the EPA set effluent limitations on any particular pollutant, those limitations were incorporated into any permit. Id. at 311, 101 S.Ct. 1784. The defendants operated their sewer systems under permits obtained from the Wisconsin state agency which was granted permitting authority under EPA’s supervision. Id. The defendants did not “fully comply” with their permits’ requirements, however, and the state permitting agency brought an enforcement action in state court. Id. The state court entered a judgment setting effluent limitations and requiring construction of sewage overflow controls. Id.
In the meantime, the State of Illinois continued to pursue its federal common law nuisance abatement action in federal court. Id. Illinois won at the trial level, and obtained injunctive relief ordering construction of facilities to eliminate sewer overflows and to achieve specified limits on effluents. Id. “Both the aspects of the decision concerning overflows and concerning effluent limitations ... went considerably beyond the terms of [the defendants’] previously issued permits and the enforcement order of the state court.” Id. at 312, 101 S.Ct. 1784.
On appeal, the Supreme Court held that the CWA displaced Illinois’s federal common law public nuisance abatement action because Congress had “occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency.” Id. at 317, 101 S.Ct. 1784. Specifically, the Supreme Court found the CWA established “an all-encompassing program of water pollution regulation. Every point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals.” Id. at 318, 101 S.Ct. 1784 (footnote omitted). This comprehensive treatment of water pollution left “no room for courts to attempt to improve on that program with federal common law.” Id. at 319, 101 S.Ct. 1784.
The Supreme Court did not rely only on the comprehensive nature of the regulatory scheme. It evaluated the particular nuisance abatement claims brought by Illinois to determine whether Congress spoke directly to the particular question at issue. With respect to the requested relief for effluent limitations, the Supreme Court noted that the EPA had set effluent limitations and that the defendants’ permits incorporated those limitations. Id. at 319-20, 101 S.Ct. 1784. Consequently, there was “no question” that Congress had addressed the problem of effluent limitations and therefore there was “no basis for a *861 federal court to impose more stringent limitations than those imposed under the regulatory regime by reference to federal common law.” Id. at 320, 101 S.Ct. 1784. The Court reached a similar conclusion with respect to the requested relief for construction of controls for overflows because overflows were nothing more than point source discharges fully covered by the permitting process under the Act. Id. at 320-21, 101 S.Ct. 1784. Accordingly, there was “no ‘interstice’ here to be filled by federal common law.” Id. at 323, 101 S.Ct. 1784. Moreover, the Supreme Court noted that one reason federal common law was needed in Milwaukee I was the lack of forum for Illinois to protect its rights, but this problem had been resolved through the CWA’s scheme, which allowed affected States the opportunity to participate in the permitting process. Id. at 325-26, 101 S.Ct. 1784.
Finally, the Supreme Court rejected the argument that language in the CWA’s citizen-suit provision preserved a federal common law remedy. Id. at 328-29, 101 S.Ct. 1784. Subsection 505(e) of the CWA provided:
Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).
Id. at 328, 101 S.Ct. 1784 (emphasis omitted). The Supreme Court concluded this did not preserve the federal common law nuisance abatement claim because the language meant only that the specific subsection providing for a citizen suit does not revoke other remedies, but it did not mean that “the Act as a whole does not supplant formerly available federal common-law actions.” Id. at 328-29, 101 S.Ct. 1784.
Neither Milwaukee I nor Milwaukee II involved damages claims. Both were for abatement of a nuisance and sought injunctive relief. However, the dissent in Milwaukee II argued that legislative history indicated Congress did not intend for the CWA to preclude actions for damages even if the alleged polluter was in compliance with regulatory standards under the Act. Id. at 343, 346 n. 21, 101 S.Ct. 1784.
The majority in Milwaukee II did not comment on the availability of a federal common law nuisance claim for damages under the CWA until it decided Middlesex County Sewerage Authority v. National Sea Clammers Association, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), approximately two months later. In Middlesex, an organization whose members harvested fish and an individual member of that organization brought suit in federal district court against various governmental agencies and officials in New York, New Jersey, and the United States Government. 453 U.S. at 4, 101 S.Ct. 2615. The plaintiffs alleged that waste materials were being discharged into interstate waterways which were polluting the Atlantic Ocean, resulting in a massive algae growth which negatively affected fishing and related industries in the Atlantic. Id. at 4-5, 101 S.Ct. 2615. The plaintiffs brought statutory claims under the FWPCA, the Marine Protection, Research, and Sanctuaries Act of 1972 (“MPRSA”), the National Environmental Policy Act of 1969, state law environmental statutes, and the Federal Tort Claims Act. Id. at 5 n. 6, 101 S.Ct. 2615. The plaintiffs also brought claims under various provisions of the United States Constitution, federal common law, and state tort law. Id. The plaintiffs sought injunctive relief, declaratory relief, compensatory damages, and punitive damages. Id. at 5, 101 S.Ct. 2615.
*862 The Supreme Court held that it need not decide whether private parties such as the plaintiffs in Middlesex could bring a federal common law nuisance claim for damages because the FWPCA displaced the federal common law of nuisance in the area of water pollution as the Court held in Milwaukee II, and the MPRSA likewise displaced federal common law with respect to ocean dumping. Id. at 21-22, 101 S.Ct. 2615. The dissent in Middlesex noted the apparent conflict between this result and legislative history which suggested that Congress intended that a common law action for damages caused by pollution would not be barred even where the defendant had complied with the FWPCA’s requirements. Id. at 31 & n. 15, 101 S.Ct. 2615. Middlesex thus holds that where a federal common law nuisance claim for injunctive relief is displaced, a federal common law nuisance claim for damages claim likewise is displaced.
However, the Supreme Court’s ruling in Exxon Shipping Co. v. Baker, 554 U.S. 471, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008), appears to be a departure from Middlesex. In Exxon, various classes of plaintiffs brought federal maritime common law claims seeking compensatory damages for injuries arising out of the Exxon Valdez oil tanker spill off the Alaskan coast. 554 U.S. at 475-76, 479, 128 S.Ct. 2605. Additionally, a subclass of plaintiffs sought punitive damages under federal maritime common law. Id. at 479, 128 S.Ct. 2605. The defendants stipulated to negligence and liability for compensatory damages. Id. However, the parties disputed whether the defendants were liable for punitive damages. Id. at 479-80, 128 S.Ct. 2605. A jury found the defendants liable for $5 billion in punitive damages. Id. at 481, 128 S.Ct. 2605.
On appeal, the Supreme Court considered whether the CWA displaced the availability of punitive damages under federal maritime common law. Id. at 488-89, 128 S.Ct. 2605. The Supreme Court rejected the defendants’ argument that the CWA’s penalties for water pollution preempted common law punitive damages remedies available under maritime law. Id. Title 33 U.S.C. § 1321(o) specifically preserved damages claims “under any provision of law” for anyone harmed by a discharge of oil or other hazardous substance as against any owner or operator of a vessel, although it did not specify the source of law for any such damages claim, federal or state. Id. at 488, 128 S.Ct. 2605. The Supreme Court rejected the argument that “any tort action predicated on an oil spill is preempted unless § 1321 expressly preserves it” — a position which the defendants did not attempt to defend — because the Court found it “too hard to conclude that a statute expressly geared to protecting “water,’ ‘shorelines,’ and ‘natural resources’ was intended to eliminate sub silentio oil companies’ common law duties to refrain from injuring the bodies and livelihoods of private individuals.” Id. at 488-89, 128 S.Ct. 2605.
The Court also rejected the defendants’ argument that although the CWA did not displace compensatory damages, it displaced punitive damages for economic loss. Id. The Supreme Court stated that “nothing in the statutory text points to fragmenting the recovery scheme this way, and we have rejected similar attempts to sever remedies from their causes of action.” Id. at 489, 128 S.Ct. 2605 (citing Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255-56, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984)). The Supreme Court saw “no clear indication of congressional intent to occupy the entire field of pollution remedies,” and allowing punitive damages for private harms would not have “any frustrating effect on the CWA remedial scheme, which would point to preemption.” Id.
*863 In reaching this conclusion, the Supreme Court specifically distinguished Middlesex and Milwaukee II on the basis that the plaintiffs’ common law nuisance claims in those two cases “amounted to arguments for effluent-discharge standards different from those provided by the CWA. Here, [the plaintiffs’] private claims for economic injury do not threaten similar interference with federal regulatory goals with respect to ‘water,’ ‘shorelines,’ or ‘natural resources.’ ” Id. at 489 n. 7, 128 S.Ct. 2605.
While Exxon stated that the Court has rejected “attempts to sever remedies from their causes of action,” id. at 489,128 S.Ct. 2605, Exxon made this pronouncement in the context of examining whether one form of damages ought to be severed from another form of damages without any statutory textual basis for doing so. The Exxon Court was not evaluating whether a claim for damages is of a different character than a claim for injunctive relief. In fact, the case upon which Exxon relied for that statement, Silkwood, likewise disapproved of an attempt to sever compensatory and punitive damages, but its overall holding suggests that severing rights and remedies is appropriate as between damages and injunctive relief in some circumstances.
Silkwood involved state common law tort claims brought by the estate of a woman injured by nuclear contamination from a nuclear plant at which she worked. 464 U.S. at 243, 104 S.Ct. 615. The jury awarded compensatory and punitive damages, despite evidence that the plant operator complied with most federal regulations governing nuclear safety at the plant. Id. at 244-45, 104 S.Ct. 615. The defendant plant operator argued that its compliance with the federal regulations precluded an award of punitive damages. Id. at 245, 104 S.Ct. 615. The Supreme Court rejected that argument, concluding that although Congress granted a federal entity, the Nuclear Regulatory Commission, exclusive authority to regulate safety matters at nuclear power plants, and thus states could not enjoin nuclear power plants from operating for failure to comply with state safety standards, Congress nevertheless intended to allow damages awards under state law. Id. at 250-51, 256, 104 S.Ct. 615. Indeed, the Supreme Court concluded that congressional silence on the matter of damages claims, and its failure to provide a federal remedy for injured persons, made it “difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct.” Id. at 251, 104 S.Ct. 615.
Silkwood dealt with federal preemption of state law claims, and thus is not directly applicable to a federal displacement analysis. See Milwaukee II, 451 U.S. at 316-17, 101 S.Ct. 1784. However, to the extent Exxon cited it in support of the proposition that compensatory and punitive damages generally are not severed absent a statutory basis to do so, that is all the weight Silkwood can bear. Under Silk-wood, a state law claim for injunctive relief would be preempted by federal law because safety regulation at nuclear facilities is a matter exclusively within federal authority, while a state law damages claim nevertheless would not be preempted. Consequently, Silkwood supports the conclusion that the right and the remedy may indeed be severed when the particular claim at issue seeks injunctive relief versus damages.[1]
*864 B.
Against this backdrop of cases under the CWA, the Supreme Court in recent years has addressed the applicability of the CAA to greenhouse gases and whether the CAA displaces federal common law. In Massachusetts v. EPA the Supreme Court evaluated a claim by several states, local governments, and private entities that the EPA had abdicated its responsibility under the CAA to regulate the emissions of greenhouse gases from motor vehicles. 549 U.S. 497, 505, 510, 514, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007). The Supreme Court held that greenhouse gases fell within the CAA’s definition of “air pollutant” under 42 U.S.C. § 7602(g), and the EPA therefore has the statutory authority to regulate the emission of greenhouse gases from new motor vehicles. Id. at 532, 127 S.Ct. 1438.
The Supreme Court subsequently evaluated whether the. CAA displaced federal common law nuisance abatement claims based on greenhouse gas emissions in AEP. In AEP, several States, a city, and three private land trusts brought federal common law nuisance abatement claims against four private power companies and the federal Tennessee Valley Authority. 131 S.Ct. at 2532. The AEP plaintiffs sought injunctive relief in the form of emissions caps on the five defendants, whom the complaints identified as the five largest carbon dioxide emitters in the United States. Id. at 2534. The Supreme Court held that the CAA “and the EPA actions it authorizes displace any federal common law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired power plants.” Id. at 2537. The Supreme Court noted that greenhouse gases were air pollutants subject to EPA regulation after Massachusetts, and the CAA “speaks directly” to carbon dioxide emissions from stationary sources such as the AEP defendants’ plants. Id.
To reach this conclusion, the Supreme Court analyzed the scope of the CAA with respect to regulation of stationary sources;
Section 111 of the Act directs the EPA Administrator to list “categories of stationary sources” that “in [her] judgment ... caus[e], or contribute] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.” [42U.S.C.]§ 7411(b)(1)(A). Once EPA lists a category, the agency must establish standards of performance for emission of pollutants from new or modified sources within that category. § 7411(b)(1)(B); see also § 7411(a)(2). And, most relevant here, § 7411(d) then requires regulation of existing sources within the same category. For existing sources, EPA issues emissions guidelines, see 40 C.F.R. § 60.22, .23 (2009); in compliance with those guidelines and subject to federal oversight, the States then issue performance standards for stationary sources within their jurisdiction, § 7411(d)(1).
Id. at 2537-38 (footnote omitted). The Supreme Court also evaluated the enforcement mechanisms of emission standards in the CAA, including enforcement by States, by the EPA, and a citizen-suit provision pursuant to which “any person” may enforce emission standards in federal court. *865 Id. at 2538 (citing 42 U.S.C. § 7604(a)). Additionally, States and private parties may petition the EPA to set an emission standard if EPA has not done so. Id. (citing 42 U.S.C. § 7607(b)). The Supreme Court concluded that the CAA “thus provides a means to seek limits on emissions of carbon dioxide from domestic power plants — the same relief the plaintiffs seek by invoking federal common law.” Id.
The Supreme Court concluded the AEP plaintiffs’ federal common law nuisance abatement claim therefore was displaced, even though EPA had not yet set emission standards for carbon dioxide: “The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants; the delegation is what displaces federal common law.” Id. The EPA’s decision whether to regulate was itself subject to judicial review, but Congress through the CAA entrusted the “complex balancing” involved in assessing the appropriate amount of regulation of greenhouse gases to the EPA in the first instance, not the federal courts. Id. at 2539 (citing 42 U.S.C. § 7411(a), (b), (c)(1), (d), (j)(l)(A)). Congress designated EPA to address these competing concerns because an “expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions.” Id. at 2539. Allowing federal judges to “set limits on greenhouse gas emissions in face of a law empowering EPA to set the same limits,” would upset the scheme Congress set forth in the CAA. Id. at 2540.
C.
Under AEP, federal common law nuisance abatement claims are displaced by the CAA. And under Middlesex, if federal common law nuisance abatement claims are displaced, so are federal common law nuisance damages claims.
While Exxon suggests a different result, Exxon appears to depart from Milwaukee II and Middlesex. Exxon concluded that the savings clause in 33 U.S.C. § 1321(o) preserved federal maritime common law damages claims despite Congress’s provision of other federal remedies in § 1321. Exxon, 554 U.S. at 488-89, 128 S.Ct. 2605. The savings clause in section 1321(o)(l) provides:
Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.
Section 1321(o )(1) is similar to the citizen suit provision in the CWA, which provides that “[njothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation to seek any other relief....” 33 U.S.C. § 1365(e). Milwaukee II concluded this language did not preserve federal common law nuisance claims:
The subsection is common language accompanying citizen-suit provisions and we think that it means only that the provision of such suit does not revoke other remedies. It most assuredly cannot be read to mean that the Act as a whole does not supplant formerly available federal common-law actions but only that the particular section authorizing citizen suits does not do so.
451 U.S. at 328-29, 101 S.Ct. 1784. Section 1321(o) did not specify that it was preserving federal maritime common law damages claims in the face of a federal *866 enactment on the subject of federal remedies for oil spills any more than § 1365(e) stated it was preserving federal common law nuisance claims in the face of the CWA. Exxon’s interpretation of this clause appears to.be at odds with Milwaukee II.
Exxon also seems to stray from Middle-sex. Exxon’s reasoning for distinguishing Middlesex on the basis of the requested remedy is not entirely clear. Exxon either failed to acknowledge that the Middlesex plaintiffs sought damages as well as injunctive relief, or it concluded that the amount of damages requested in Middle-sex effectively would have enjoined the defendants from engaging in ocean dumping, essentially setting a different effluent standard.
Exxon’s departure from Milwaukee II and Middlesex may be explained by the fact that the defendants in Exxon apparently did not argue that the federal maritime common law' claim was displaced in its entirety and conceded liability and compensatory damages. Another explanation may be that the Exxon Court viewed § 1321 as not so comprehensive as to displace federal maritime common law negligence claims for damages, unlike the CWA provisions the Milwaukee II Court found displaced federal common law nuisance claims.
Regardless of Exxon’s effect on the viability of federal maritime common law negligence claims for damages under § 1321, Milwaukee II, Middlesex, AEP, and the comprehensive nature of the CAA lead to the conclusion that Kivalina’s federal common law nuisance claim for damages in this case is displaced. Congress has spoken directly to the question of what remedies are available under federal law for air pollution. The CAA sets forth a comprehensive regulatory scheme committed to an expert agency, coupled with a variety of enforcement mechanisms, including enforcement by States, the EPA, and private parties. Consequently, the lack of a federal damages remedy is not indicative of a gap which federal common law must fill. Congress could have included a federal damages cause of action in the CAA, and it may add one at any time, but thus far it has opted not to do so. By supplying a federal remedy Congress chose not to provide, this Court would not be “filling a gap,” it would be “providing a different regulatory seheme” than the one chosen by Congress. Milwaukee II, 451 U.S. at 324 n. 18, 101 S.Ct. 1784.
Displacement of the federal common law does' not leave those injured by air pollution without a remedy. Once federal common law is displaced, state nuisance law becomes an available option to the extent it is not preempted by federal law. AEP, 131 S.Ct. at 2540 (“In light of our holding that the Clean Air Act displaces federal common law, the availability vel non of a state lawsuit depends, inter alia, on the preemptive effect of the federal Act.”). The district court below dismissed Kivalina’s state law nuisance claim without prejudice to refiling it in state court, and Kivalina may pursue whatever remedies it may have under state law to the extent their claims are not preempted.
I therefore concur in the majority opinion that the CAA and the EPA action the Act authorizes displace Kivalina’s claims. Because Kivalina’s federal common law nuisance damages claim is displaced, the Court need not address the open question of whether Kivalina is the type of party that can bring a federal common law nuisance claim. See AEP, 131 S.Ct. at 2536-37 (noting that the Supreme Court had “not yet decided whether private citizens ... may invoke the federal common law of nuisance to abate out-of-state pollution,” but concluding the question was “academic” because the plaintiffs’ federal com *867 mon law nuisance claim was displaced by the CAA).
II.
The district court found Kivalina lacked standing. Standing is a jurisdictional issue deriving from the “case or controversy” requirement of Article III of the United States Constitution. Cole v. Oroville Union High Sch. Dist., 228 F.3d 1092, 1098 (9th Cir.2000). Standing depends on “whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy, and serves to ensure that legal questions presented to the court will be resolved in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.” Hall v. Norton, 266 F.3d 969, 975 (9th Cir.2001) (quotations, alterations, and internal citation omitted).
The party invoking federal jurisdiction bears the burden of establishing standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The nature of that burden depends on the stage of the litigation. Am. Fed’n of Gov’t Emps. Local 1 v. Stone, 502 F.3d 1027, 1032 (9th Cir.2007). A plaintiff must support each element of the standing inquiry “in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.” Lujan, 504 U.S. at 561, 112 S.Ct. 2130. Consequently, at the dismissal stage, the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences therefrom in the nonmoving party’s favor. Ass’n for L.A. Deputy Sheriffs v. Cnty. of L.A., 648 F.3d 986, 991 (9th Cir.2011). A complaint’s “general factual allegations of injury resulting from the defendant’s conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.” Jewel v. Nat’l Sec. Agency, 673 F.3d 902, 907 (9th Cir.2011) (alteration, citation, and internal quotation marks omitted). However, the complaint must allege sufficient facts plausibly establishing each element of the standing inquiry. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); Lujan, 504 U.S. at 561, 112 S.Ct. 2130; Barnum Timber Co. v. EPA, 633 F.3d 894, 899 (9th Cir.2011).
To establish standing under Article III of the Constitution, a plaintiff must show “(1) injury in fact; (2) causation; and (3) likelihood that the injury will be redressed by a favorable decision.” Am. Civil Liberties Union of Nev. v. Lomax, 471 F.3d 1010, 1015 (9th Cir.2006). Specifically with respect to causation, the plaintiff must demonstrate that its injury is “fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.” Pritikin v. Dep’t of Energy, 254 F.3d 791, 797 (9th Cir.2001) (alterations in original) (citation omitted). The “line of causation” between the defendant’s action and the plaintiffs harm must be “more than ‘attenuated.’ ” Maya v. Centex Corp., 658 F.3d 1060, 1070 (9th Cir. 2011) (quoting Allen v. Wright, 468 U.S. 737, 757, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). However, a “causal chain does not fail simply because it has several ‘links,’ provided those links are ‘not hypothetical or tenuous’ and remain ‘plausible].’ ” Id. (quoting Nat’l Audubon Soc., Inc. v. Davis, 307 F.3d 835, 849 (9th Cir.2002)). But where the causal chain “involves numerous third parties whose independent decisions collectively have a significant effect on plaintiffs’ injuries, ... the causal chain [is] too weak to support standing at the pleading stage.” Id. (citations and internal quotation marks omitted).
*868 Kivalina alleges that it is located at the tip of a barrier reef, and that global warming has harmed Kivalina because sea ice which used to protect Kivalina from coastal storms, waves, and surges now forms later in the year, attaches to the coast later, breaks up earlier, and is less extensive. Kivalina thus is more exposed to storm waves and surges which are eroding the land upon which Kivalina sits to such an extent that Kivalina must relocate. According to the Complaint, Appellees are various oil, energy, and utility companies who annually emit millions of tons of greenhouse gases, and whom Kivalina thus identifies as “substantial contributors” to global warming.
Kivalina’s Complaint describes global warming as follows:
Energy from the sun heats the Earth, which reradiates the energy to space. Carbon dioxide and other greenhouse gases absorb some of the outgoing infrared energy, raising the temperature of the Earth’s atmosphere. Carbon dioxide is by far the most significant greenhouse gas emitted by human activity.... A large fraction of carbon dioxide emissions persist in the atmosphere for several centuries, and thus have a lasting effect on climate. Atmospheric concentrations of carbon dioxide and other greenhouse gases continue to increase as each year’s emissions are added to those that came before. Carbon dioxide levels in the atmosphere have increased by 35 percent since the dawn of the industrial revolution in the 18th century, and more than one-third of the increase has occurred since 1980.... Processes on land and in the oceans that remove carbon dioxide from the atmosphere are unable to keep pace with these emissions. As a result, the natural carbon cycle is out of balance and carbon dioxide levels in the atmosphere are increasing every year.... The global linear warming trend over the last 50 years is twice that of the previous 50 years.... The Arctic is warming at approximately twice the global average.
According to the Complaint, global warming and the recognition of its potential implications are “not new,” with observations, calculations, and predictions as to its effect dating back as far as the late 1800s.
Kivalina alleges specifically with respect to Appellees that greenhouse gas emissions from Appellees’ operations “no matter where such operations are located, rapidly mix in the atmosphere and cause an increase in the atmospheric concentration of carbon dioxide and other greenhouse gases worldwide. The heating that results from the increased carbon dioxide and other greenhouse gas concentrations to which defendants contribute cause specific, identifiable impacts in Kivalina.” Kivalina further alleges that Appellees “knew that their individual greenhouse gas emissions were, in combination with emissions and conduct of others, contributing to global warming and causing injuries to entities such as the Plaintiffs.”
Kivalina has not met the burden of alleging facts showing Kivalina plausibly can trace their injuries to Appellees. By Kivalina’s own factual allegations, global warming has been occurring for hundreds of years and is the result of a vast multitude of emitters worldwide whose emissions mix quickly, stay in the atmosphere for centuries, and, as a result, are undifferentiated in the global atmosphere. Further, Kivalina’s allegations of their injury and traceability to Appellees’ activities is not bounded in time. Kivalina does not identify when their injury occurred nor tie it to Appellees’ activities within this vast time frame. Kivalina nevertheless seeks to hold these particular Appellees, out of all the greenhouse gas emitters who ever *869 have emitted greenhouse gases over hundreds of years, liable for their injuries.
It is one thing to hold that a State has standing to pursue a statutory procedural right granted to it by Congress in the CAA to challenge the EPA’s failure to regulate greenhouse gas emissions which incrementally may contribute to future global warming. See Massachusetts, 549 U.S. at 516-20, 127 S.Ct. 1438. It is quite another to hold that a private party has standing to pick and choose amongst all the greenhouse gas emitters throughout history to hold liable for millions of dollars in damages.
III.
For the reasons articulated above, I concur in the majority’s conclusion that the CAA displaces Kivalina’s federal common law nuisance claim for damages. Additionally, I would hold that Kivalina lacks standing.

. It is not inexorably the rule that the unavailability of one remedy necessarily precludes the availability of another remedy arising out of the same asserted right or injury. See, e.g., Cipollone v. Liggett Group, Inc., 505 U.S. 504, 518-19, 112 S.Ct. 2608, 120 L.Ed.2d 407 *864 (1992) (holding that while stale law warning or labeling requirements were preempted by federal tobacco labeling laws, (and thus a state law action for injunctive relief requiring any such labeling would be preempted), state law damages claims based on smoking-related injuries were not preempted); Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (permitting a suit in federal court to prospectively enjoin a state official acting in his official capacity even though a similar claim for damages could not be brought in federal court due to the Eleventh Amendment).